*$ 216°°*
*5/71*

## RTF — COMMERCIAL

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

This instrument prepared by:
Bradley J. Maddock
Lewis, Rice & Fingersh
One Petticoat Lane, Suite 500
1010 Walnut
Kansas City, Missouri 64106
(816) 421-2500

Return to: **CR8**
Republic Title of Texas, Inc.
2626 Howell Street, 10th Floor
Dallas Texas 75204

**O5R27209 CR8**

### DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING

THIS DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING (as the same may be amended or supplemented at any time, the "<u>Deed of Trust</u>") is made as of January _|_, 2006, by and among:

OAKRIDGE GOLF CLUB, L.P., a Texas limited partnership, having an address at 2800 Diamond Oaks Drive, Garland, Texas 75044, as grantor (together with its successors and assigns and any subsequent owners or lessees of the Mortgaged Property, the "<u>Borrower</u>");

MICHELE MCCUE, an individual, having an address at c/o Lewis, Rice & Fingersh, One Petticoat Lane, Suite 500, 1010 Walnut, Kansas City, Missouri 64106, as trustee (together with any successor or substitute trustee appointed pursuant to this Deed of Trust, the "<u>Trustee</u>");

### AND

HILLCREST BANK, having an address at 11111 W. 95th Street, Overland Park, Kansas 66214, as beneficiary (together with any subsequent holder or holders of the Note, the "<u>Lender</u>").

### RECITALS

A.    Certain capitalized terms used in these Recitals and elsewhere herein are defined in §19.7 of this Deed of Trust. Other terms are defined throughout the text of this Deed of Trust.

B.    Borrower has requested Lender to make the Loan to Borrower and to make the Related Loan to Related Borrower.

C.    Lender has required, as a condition to the making of the Loan, that Borrower grant this Deed of Trust to Trustee and Lender as security for payment of the Debt and performance of the Obligations, and Borrower is willing to do so.

NOW, THEREFORE, in consideration of Lender's agreement to make the Loan upon and subject to the terms of this Deed of Trust and the Loan Documents, and to make the Related Loan upon and subject to the terms of the Related Mortgage and the Related Loan Documents, and of the payment of ten dollars ($10.00) and other good and valuable consideration given by Lender to Borrower, the receipt and sufficiency of which

EXHIBIT
"C"

are hereby acknowledged by Borrower, at all times until the Debt is fully paid and the Obligations fully performed, Borrower hereby acts, and covenants, promises and agrees with Trustee and Lender, as follows:

1.    GRANTING CLAUSES

   §1.1.    Grant of the Real Estate Security.    Borrower, to secure the payment of the Debt and payment of the Obligations, hereby grants, sells, bargains, mortgages, warrants, assigns and transfers to the Trustee, in trust with power of sale, all of the following described property:

   (a)    All of the real property and interests in real property described on Exhibit A attached to and incorporated into this Deed of Trust together with: all right, title and interest of the Borrower, if any, in and to all of the buildings, structures and other improvements now or hereafter located on the Land (the "Improvements"); all of the easements, rights of way, privileges, hereditaments, gores, streets, alleys, passages, ways, waters, watercourses, rights and appurtenances belonging or appertaining to the Land; all of the right, title and interest of the Borrower in and to the streets and ways adjacent to the Land; all reversions and remainders pertaining to the Land; and all air rights, development rights, water rights and mineral rights appurtenant or belonging to the Land or relating to the Land; and

   (b)    All right, title and interest of the Borrower, if any, in and to all of the fixtures, inventory, equipment, apparatus, machinery, fittings and appliances, chattels, building materials and tangible personal property of every kind and character, now or at any time hereafter affixed to or attached to or placed upon or used in any way in connection with the complete and comfortable use, enjoyment, occupancy, operation and/or maintenance of the Improvements or the Land, including such of the foregoing as may be used in connection with the generating or distributing of air, water, heat, electricity, light, fuel or refrigeration, or for ventilating or sanitary purposes, or for the removal of dust, refuse or garbage, and all renewals, replacements and substitutions thereof, additions and accessions thereto, and all spare parts for any of the same, all of which are intended to be subject to the lien of this Deed of Trust as if part of the real estate (all the property described in this §1.1.(b) is herein collectively called, the "Fixtures"); and

   (c)    All of the Leases and the Rents and all the other benefits of any of the Land, Improvements and Fixtures; and

   (d)    All proceeds of the conversion, voluntarily or involuntarily, of any of the property described in this §1.1 into cash or liquidated claims, including proceeds of insurance and Condemnation Awards.

   TO HAVE AND TO HOLD the Mortgaged Property unto Trustee, his/her/its successors and assigns, forever.

   UNDER AND SUBJECT to Permitted Encumbrances.

   IN TRUST HOWEVER, for the purpose of securing in such order of priority as Lender shall elect, the payment of the Debt and the performance of the Obligations, in accordance with their respective terms.

   §1.2.    Grant of Security Interest and Assignment.    Borrower, to secure payment of the Debt and payment and performance of the Obligations, hereby transfers and assigns to the Trustee and to Lender, and grants to the Trustee and the Lender a security interest under the Uniform Commercial Code (as adopted and in effect in the State on the date hereof and as amended or supplemented at any time hereafter, the "Code") in and to, the following described property, whether now owned or hereafter acquired by Borrower:

F:\LRF\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

2

(a)  All of the Fixtures and all other property described in §1.1 hereof which, under any applicable law, may be deemed to be personal property or fixtures, the creation and perfection of a lien on which is governed by the Code;

(b)  All goodwill, trademarks, trade names, option rights, purchase contracts, computer records and software, books and records and general intangibles of the Borrower relating to any of the Mortgaged Property, including all rights of the Borrower under or with respect to all accounts, contract rights, instruments, chattel paper and other rights of the Borrower for payment of money for property sold or lent, for services rendered, for money lent, or for advances or deposits made, all rights of the Borrower to plans and specifications, designs, drawings, models and other matters prepared for any construction or renovation on the Land, all rights of the Borrower under any contracts executed by the Borrower as owner with any provider of goods or services in connection with any construction or renovation undertaken on, or services performed or to be performed in connection with, any part of the Mortgaged Property, and all other intangible property of the Borrower related to or used in connection with any of the Mortgaged Property (all such property described in this §1.2.(b) is herein called, the "Intangibles"); and

(c)  All the proceeds of any of the property described in this §1.2.

This Deed of Trust creates a security interest in the Fixtures, Intangibles, and all other property described in this §1.2, whether now owned or hereafter acquired by Borrower (the Fixtures, Intangibles, and all such other property are herein collectively called the "Personal Property Security"), and shall constitute a Security Agreement under the Code.

§1.3.    Assignment of Leases and Rents.  Borrower hereby absolutely and unconditionally assigns to Lender all of the Leases and Rents.  Lender shall apply any amounts received pursuant to this assignment to the payment of the Debt, the performance of the Obligations, and/or to the operation and Maintenance of the Mortgaged Property, in such order as Lender may elect, without regard to the adequacy of the security or the solvency of the Borrower.  Notwithstanding such assignment, Lender hereby grants to Borrower a revocable license to collect and retain the Rents for Borrower's own account, until an Event of Default shall occur; but upon occurrence of any Event of Default, the right herein granted to Borrower to collect the Rents shall at Lender's option, terminate.  Borrower shall apply any Rents collected first to the payment of the Debt as it becomes due and payable from time to time, and next to the performance of the Obligations, before using any Rents for any other purposes. This assignment of Rents to Lender is intended to be an absolute assignment from Borrower to Lender and not merely the passing of a security interest.  The Rents are hereby assigned absolutely by Borrower to Lender subject only to Borrower's license to collect such amounts prior to the occurrence of any Event of Default.

Notwithstanding anything seemingly to the contrary contained herein or in any of the other Loan Documents, Borrower shall not enter into or execute any Lease of any of the Mortgaged Property without the prior written approval of such Lease by Lender (which approval shall not be unreasonably withheld or delayed), Borrower hereby acknowledging and agreeing that all Leases must be in form, substance and with tenants satisfactory to Lender.

Borrower hereby represents and warrants to Lender: (A) That Borrower has full right and power to assign the Leases and Rents to Lender, and has not executed any prior and now existing assignment of any of its rights under any Lease or to any portion of the Rents to any person other than Lender; (B) That Borrower has not done any act or thing which might prevent Lender from enjoying the benefits of the

Leases and Rents assigned hereby; (C) That each of the Leases is valid and enforceable; (D) That neither Borrower nor, to the best knowledge of Borrower, the tenants are in default under any of the terms of any of the Leases; and (E) That no Rents have been collected or accepted by Borrower more than one month in advance of the time when the same become due under the terms of the Leases, except Rents collected at the execution of a Lease, which are to be applied to the Rents at the beginning of the term of the Lease, or as security for the performance of the tenant's obligations under the Lease.

Borrower hereby covenants, promises and agrees that Borrower will: (i) Observe, fulfill and perform each and every condition, covenant and provision of the Leases to be fulfilled or performed by Borrower; (ii) Enforce at the sole cost and expense of Borrower the performance or observance of each and every material covenant and condition of each of the Leases; (iii) At the sole cost and expense of Borrower, appear in and defend any action growing out of or in any manner connected with any of the Leases, Rents or the obligations or liabilities of Borrower or any party thereunder; (iv) From time to time, upon request by Lender, execute and deliver to Lender, acknowledge when appropriate and record or file in the public records when appropriate, any and all writings, including without limitation further assignments of any Lease or Leases, financing statements and other writings that Lender may deem necessary or desirable to carry out the purpose and intent of this assignment, or to enable Lender to enforce any right or rights hereunder; and (v) From time to time, upon request by Lender, furnish to Lender a true copy of any Lease.

Borrower will not, without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed): (A) Modify or alter any of the terms or provisions of any of the Leases; (B) Terminate the term of, or accept a surrender of, any of the Leases; (C) Anticipate Rents for more than one calendar month prior to the accrual thereof under the terms of the Leases; (D) Waive, or release any party under any of the Leases; (E) Pledge, transfer, mortgage or otherwise encumber or assign the Leases or the Rents; (F) Permit any Lease to be subordinated to any deed of trust or mortgage junior in lien to the Deed of Trust encumbering the leased premises; (G) In any other manner impair the value of the Leases or Rents or the security of the assignment thereof as provided herein; or (H) Execute any Lease except for actual occupancy by the lessee thereunder.

§1.4.    Fixture Filing.    From the date of its recording, this Deed of Trust shall be effective as a financing statement filed as a fixture filing with respect to all the Fixtures. For this purpose, the following information is set forth:

(a)   Name and Address of Debtor:

OAKRIDGE GOLF CLUB, L.P., a Texas limited partnership
Address:  as set forth above.

(b)   Name and Address of Secured Party:

HILLCREST BANK, a Kansas bank
Address:  as set forth above.

(c)   Borrower's organizational identification number is **800052973**

(d)   This document covers goods which are or are to become, or may be or become, fixtures. This document is to be filed in the real estate records. A description of the real estate is attached hereto as Exhibit A. Borrower is the record owner of the real estate.

F:\LRF\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

## 2.    COVENANTS AS TO PAYMENT, PERFORMANCE AND TITLE; WARRANTIES

§2.1.    Payment of Note.  Borrower shall pay to Lender the entire Debt, punctually as and when the same shall become due, without offset, counterclaim or defense.  Borrower will fully and faithfully observe and perform all of the provisions of the Loan Documents.  The Loan Documents are incorporated herein by this reference.

§2.2.    Defeasance.  If all the Debt shall be paid and the Obligations shall be performed, all at the times and in the manner provided in the Loan Documents, then the Trustee shall release or reconvey to Borrower all of the Mortgaged Property and shall release this Deed of Trust of record.

§2.3.    Warranty of Title.  Borrower warrants that: (a) Borrower has good and marketable title to an indefeasible estate in fee simple in and to the Land and the Improvements; (b) Borrower has good title to all of the rest of the Mortgaged Property; and (c) this Deed of Trust is a Lien on and security interest in the Mortgaged Property, subject to no encumbrances except Permitted Encumbrances.  Borrower shall not, without the prior written consent of Lender, install in or locate on the Mortgaged Property any equipment or fixtures which are subject to any Lien other than Permitted Encumbrances.  None of the Rents is subject to any previous assignment, nor will any of the Rents be assigned hereafter, except to Lender as security for any of the Debt and/or Obligations.

§2.4.    Agreement to Defend.  Borrower shall preserve Borrower's title and interest in the Mortgaged Property as described in §2.3, and will forever warrant and defend the validity and priority of the lien, security interest and assignment created hereby against the claims of all persons whomsoever, subject only to Permitted Encumbrances.

§2.5.    Additions to the Mortgaged Property.  All right, title and interest of Borrower in and to all extensions, improvements, betterments, renewals, substitutes and replacements of, and all additions and appurtenances to, the Mortgaged Property hereafter acquired by, or released to, Borrower, or constructed, assembled or placed by Borrower on the Land, immediately upon such acquisition, release, construction, assembling or placement, and in each such case, without any further act by Borrower, shall become subject to the lien and security interest of this Deed of Trust as though they were now owned by Borrower and specifically described in the granting clauses hereof.

§2.6.    Easements Outside the Land.  In the event any easements or rights in common or otherwise (other than revocable rights) in any lands not covered by the lien of this Deed of Trust are granted as an appurtenance to the use and operation of any of the Mortgaged Property, then this Deed of Trust shall attach to and be a lien on such easements and rights in such other lands, and the lien hereof spread to cover such easements and rights with the same force and effect as though specifically described in the granting clauses hereof.

§2.7.    Further Assurances.  Promptly upon request of Lender, Borrower shall do all acts and things, including but not limited to the execution and delivery of any further deeds, conveyances, mortgages, assignments, financing statements, continuation statements, and further assurances, deemed necessary or desirable by Lender to establish, confirm, maintain and continue the Lien and security interest created and intended to be conferred hereby and the priority thereof.  Borrower hereby appoints Lender as attorney-in-fact for Borrower to execute, deliver and file any and all such documents, writings, and other instruments as Lender may require, in order to perfect and maintain the priority of such Lien and security interest.

F:\LRP\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

§2.8.    Warranties of Borrower.  Borrower covenants and warrants that (i) it is a limited partnership duly formed, existing and in good standing under the laws of the State of Texas (the "State"), (ii) it is duly qualified to do business and is in good standing in the State of Texas, (iii) it has the power, authority and legal right to carry on the business now being conducted by it and to engage in the transactions contemplated by the Loan Documents, (iv) the execution and delivery of and the carrying out of the transactions contemplated by the Loan Documents, the execution and delivery of the Loan Documents, and the performance and observance of the provisions of the Loan Documents, have been duly authorized by all necessary actions of Borrower and its partners, and will not conflict with or result in a breach of the terms or provisions of any existing law or any existing rule, regulation or order of any Governmental Authority (defined in §3.1 below) or of the partnership agreement of Borrower, (v) all instruments, documents, financial statements and certificates submitted to Lender by or on behalf of Borrower in connection with the Loan or the Loan Documents are true, correct and complete, and contain no misrepresentations, and (vi) there is no action, suit, proceeding or litigation pending, or to Borrower's knowledge threatened, against Borrower or any of the Mortgaged Property which has not been disclosed to Lender in writing.

## 3.    COVENANTS AS TO IMPOSITIONS

§3.1.    Payment of Impositions.  Prior to the date on which any interest or penalties shall commence to accrue thereon, Borrower will pay and discharge, or cause to be paid and discharged, all taxes and assessments of every kind and nature now or hereafter assessed against or levied upon any of the Mortgaged Property or the revenues, rents, issues or profits thereof by the United States of America, the State, or any political subdivision of either of them (each of such Persons, together with any court, agency, department, commission, board, bureau, officer or instrumentality of any of them, is herein called a "Governmental Authority"), including real and personal property taxes, general and special assessments, inspection and license fees, water and sewer rents and charges (all such taxes, assessments and other charges are herein called, the "Impositions").  After prior written notice to Lender, Borrower may contest, in good faith and by appropriate legal proceedings timely commenced and diligently prosecuted with continuity to completion, the validity and applicability of any Legal Requirement and the validity or amount of any Imposition or mechanic's or materialmen's Lien, provided that:

(a)  no Event of Default, nor any event or circumstance which, with the giving of notice or passage of time or both would constitute an Event of Default, shall have occurred or exist;

(b)  Borrower shall provide to Lender such cash or other security assuring compliance with the Legal Requirement or the payment of the Imposition or Lien contested, with interest and penalties, if any, in amounts satisfactory to Lender, as Lender may request;

(c)  such contest operates as a stay of or prevents enforcement of any contested Legal Requirement, Imposition or Lien (or any judgment based thereon) against the Mortgaged Property;

(d)  Borrower shall pay all fees and expenses of Lender and Trustee in connection with any such contest or proceeding, including without limitation reasonable attorney's fees and expenses;

(e)  such contest operates to prevent any interruption of occupancy of the Mortgaged Property as a result of the contested Legal Requirement, Imposition or Lien not being complied with or paid; and

(f)  if such contest is terminated adversely to the contest or discontinued, Borrower shall immediately comply with such Legal Requirement and pay such Imposition and any such Lien.

F:\LRF\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

§3.2.    Escrow Deposits. If an Event of Default shall have occurred and Lender shall have so requested by written notice to Borrower, Borrower will deposit with Lender within ten (10) days after such notice is given, a sum of money equal to the amount needed to pay the annual real estate taxes and assessments and premiums for insurance required by §4.1 hereof by the next Escrow Date for such taxes, assessments, and premiums, less the amount to be deposited under the next sentence hereof between the date hereof and such Escrow Date (such amount to be calculated separately for taxes and for insurance premiums, if the Escrow Date for them is different). Borrower shall also deposit with Lender contemporaneously with each monthly payment coming due under the Note after such notice is given, a sum equal to one-twelfth (1/12) of Lender's estimate from time to time of the amount needed to pay the annual real estate taxes and assessments and premiums for insurance required by §4.1 hereof by the Escrow Date for such taxes, assessments and premiums. Lender shall deposit all such amounts in a non-interest bearing account separate and apart from Lender's general assets, for application to the real estate taxes, assessments and insurance premiums as the same come due. If any Event of Default shall occur, Lender shall have the right, at its election, to apply any amounts in such account against all or any part of the Debt secured by this Deed of Trust. If the real estate taxes and assessments and insurance premiums for which deposits are required to be escrowed pursuant to this §3.2 shall at any time exceed the estimate therefor and the amounts paid into escrow under this §3.2, Borrower shall on demand make good the deficiency. Borrower will furnish to Lender tax and insurance bills in sufficient time to enable Lender to pay such taxes and premiums, before interest and penalties accrue thereon. All determinations of the amount so payable and of the fractional part thereof to be deposited with Lender from time to time, so that the aggregate of such deposits shall be sufficient to pay the real estate taxes, assessments and insurance premiums, shall be made by Lender in its sole reasonable discretion. Nothing herein contained shall be deemed to affect any right or remedy of Lender under any other provisions of this Deed of Trust or under any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Default Rate, to the Debt.

§3.3.    Evidence of Payment. Within thirty (30) days after the date when any Impositions which are or could become a Lien on any part of the Mortgaged Property would become delinquent, Borrower will furnish to Lender official receipts of the appropriate Governmental Authorities to which the Impositions are payable, or other evidence reasonably satisfactory to Lender evidencing the payment thereof, unless Lender has paid such Impositions from the sums deposited under §3.2 hereof (in which event Lender will, upon Borrower's request, furnish to Borrower reasonably satisfactory evidence of the payment of the same). The certificate, advice or bill of the appropriate official designated by law to receive payment of any Imposition indicating non-payment of such Imposition shall be conclusive evidence (as between Lender and Borrower) that such Imposition is due and unpaid, and Lender may rely thereon.

4.    INSURANCE

§4.1.    Insurance Required. During the course of any construction or repair of Improvements on the Land, Borrower shall maintain and keep in effect a policy of builder's completed value risk insurance against "all risks of physical loss", including collapse and transit coverage, with deductibles not to exceed $5,000, in non-reporting form, covering the total value of work performed and equipment, supplies and materials furnished in connection with such construction or repair of the Improvements, and containing the "permission to occupy upon completion of work or occupancy" endorsement. After completion of the initial construction or repair of the Improvements, Borrower will keep the Mortgaged Property insured against those risks covered under a standard fire and extended coverage policy (and with vandalism and malicious mischief coverage) and against such other risks (including without limitation, rent loss, business interruption, boiler and machinery, flood and so-called "all risk" coverage) as Lender may from time to time require, in the amount of the full

F:\LRF\RJM\CEenta\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

insurable value thereof on a replacement cost basis with a company or companies and in such form and with such endorsements as may be required by Lender from time to time. The proceeds of said insurance shall be payable to Lender and shall be applied as provided in §9.2 hereof. The insurance policies shall be endorsed with a standard non-contributory mortgagee clause acceptable to Lender, and contain a loss payable clause under which all proceeds under said policies shall be made directly to Lender, and may only be cancelled or modified upon not less than thirty (30) days' prior written notice to Lender. Borrower will also carry public liability insurance, in such form, amounts and with such companies as Lender may from time to time require, with Lender included thereon as a named insured under an endorsement satisfactory to Lender. The policies evidencing all insurance referred to in this §4.1, together with receipts for the payment of premiums thereon shall be delivered to and held by Lender, and must be satisfactory to Lender in all respects. Lender shall not by the fact of approving, disapproving, accepting, preventing, obtaining or failing to obtain any insurance, incur any liability for the form or legal sufficiency of insurance contracts, solvency of insurance companies, or payment of lawsuits, and Borrower hereby expressly assumes full responsibility therefor and for any liability, if any, thereunder. In the event of foreclosure of this Deed of Trust, or other transfer of title to the Mortgaged Property in extinguishment of the Debt, all right, title and interest of the Borrower in and to any insurance policies or proceeds referred to in this §4.1 (including any pre-paid premiums or deposits) then in force, shall pass to the purchaser or grantee. If any Casualty shall occur, Borrower shall promptly make proof of loss to the insurers, and Lender may make proof of loss if Borrower does not do so within fifteen (15) days after the Casualty occurs. Borrower shall not adjust or compromise any claim in excess of $5,000 under such insurance without the prior written approval of Lender. Unless Borrower provides evidence of the insurance coverage required by this §4.1, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the Mortgaged Property. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Mortgaged Property. Borrower may later cancel any insurance purchased by Lender, but only after providing evidence that Borrower has obtained insurance as required by this §4.1. If Lender purchases insurance for the Mortgaged Property, Borrower will be responsible for the costs of that insurance, including the insurance premium, interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding Debt. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

5.   MAINTENANCE AND REMOVAL; PERMITTED USES

§5.1.   Permitted Removal; Waste.   Except as required for construction or renovation of the Improvements pursuant to plans and specifications approved by Lender, Borrower will not cause or permit any Improvement to be removed or demolished. No Fixture shall be removed, severed or destroyed, without the prior written consent of Lender, unless simultaneously with, or prior to, any such permitted removal such Fixture has been replaced with another Fixture of at least equal value. By such removal and replacement Borrower shall be deemed to have subjected such Fixtures to the Lien of this Deed of Trust. Borrower will not abandon, or cause or permit any waste to, the Mortgaged Property.

§5.2.   Maintenance.   Throughout the term of this Deed of Trust, Borrower will keep the Mortgaged Property in good order and condition, and do all necessary Maintenance. All Maintenance shall be equal in quality and class to the original work. The standard for Maintenance required shall be that which is appropriate for facilities and buildings of similar construction and class, provided that Borrower shall in any event do all Maintenance necessary to avoid any structural damage or injury to the Improvements, to comply with all Legal Requirements and to keep the Improvements in a proper condition for their Permitted Uses. Borrower

will not permit any condition to exist on the Mortgaged Property which would wholly or partially invalidate the insurance thereon.

§5.3.    Inspection of Lender.    Upon 24 hours written notice to Borrower, Lender and Lender's representatives may enter the Mortgaged Property at reasonable times to inspect the same.  If any Event of Default occurs, Lender may, at its option, enter the Mortgaged Property to protect, restore or do Maintenance on any part thereof.  Lender shall not be liable for any such entry upon the Mortgaged Property.

§5.4.    Permitted Uses.    Borrower will use the Mortgaged Property as a golf and club facility, including restaurants and golf training area, and for other uses reasonably ancillary to such uses, or such other uses as may be approved in advance in writing by Lender (the "Permitted Uses").

6.    COMPLIANCE WITH LAWS, ORDINANCES, ETC.

§6.1.    Compliance Required.    Borrower shall promptly comply with all present and future Legal Requirements, ordinary or extraordinary, foreseen or unforeseen, and all provisions of all instruments of record affecting the Mortgaged Property.  Borrower will not make any application to any federal, state or local Governmental Authority for a change in zoning affecting the Mortgaged Property, nor will Borrower consent to any such change, without the prior written consent of Lender.

7.    CHANGES AND ALTERATIONS BY BORROWER

§7.1.    Conditions to Permitted Changes.    Borrower shall have the right from time to time to make changes and alterations in or to the Improvements, at Borrower's expense, subject, however, to the condition that no structural change or alteration, or change which would impair the value of the Mortgaged Property, shall be undertaken without the prior written consent of the Lender.

8.    MECHANICS' AND OTHER LIENS

§8.1.    Payment of Claims; Prohibition on Liens.    Borrower will pay, from time to time when the same shall become due, all claims and demands of contractors, subcontractors, architects, mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a Lien on any of the Mortgaged Property.  Borrower will not create or permit to accrue or suffer to exist any Lien, except Permitted Encumbrances, upon any of the Mortgaged Property, including the Leases and Rents; and shall promptly cause any other Lien whatsoever to be paid and discharged.  Borrower shall pay all Liens included in Permitted Encumbrances in accordance with their terms, when and as the same become due.

9.    DAMAGE OR DESTRUCTION

§9.1.    Notice of Casualty; Covenant to Rebuild.    If any Casualty shall occur, Borrower shall promptly give written notice thereof to Lender, describing the damage and the Casualty.  Regardless of the damage resulting from any Casualty, and whether or not the Net Insurance Proceeds shall be sufficient or made available for the purpose, Borrower shall promptly commence the Restoration, and prosecute it with diligence and continuity to completion.  If (a) estimates received, and/or made, by Lender disclose that the cost of Restoration would be in excess of the amount of the Net Insurance Proceeds made available therefor, or (b) during the period of Restoration the amount of the Net Insurance Proceeds made available for the Restoration shall not be sufficient to complete such Restoration, then in either such event, Borrower shall deposit with Lender such cash or other security as shall be satisfactory to Lender with respect to the deficiency.

F:\LRF\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

§9.2.    <u>Application of Proceeds</u>. All insurance proceeds shall be paid to Lender and applied by Lender first to payment of the actual costs, fees and expenses, if any, incurred by Lender in connection with proof of and adjustment of the loss and settlement with the insurance company. The Net Insurance Proceeds shall be applied by Lender (a) to the payment of the Debt and/or the performance of the Obligations, or (b) at Lender's option, to the payment of any of the cost of the Restoration.

§9.3.    <u>Disbursement of Proceeds</u>. If Net Insurance Proceeds are to be applied to the Restoration, Lender shall hold such Net Insurance Proceeds, together with any amounts and security deposited with Lender pursuant to §9.1 and §10.2 hereof, and advance the same for costs of the Restoration from time to time as the Restoration progresses. Such funds will be advanced upon written request of Borrower, and upon Borrower's compliance with such requirements as to the disbursement thereof as Lender shall reasonably impose; provided, however, that if the amount of such Net Insurance Proceeds to be applied to the Restoration is not more than the De Minimus Proceeds Amount, the same shall simply be paid over to Borrower to apply to the Restoration.

§9.4.    <u>Amounts Deposited With Lender</u>. Lender shall have, and Borrower hereby grants to and creates in favor of Lender, a first lien on and security interest in and right of set-off against any sums of money or other security deposited with Lender pursuant to §9.1 and §10.2 and the proceeds thereof as security for the payment of the Debt and performance of the Obligations.

10.  <u>CONDEMNATION</u>

§10.1.    <u>Notice of Condemnation; Participation</u>. Borrower shall give Trustee and Lender immediate notice of any actual or threatened Condemnation. In the event that any of the Mortgaged Property shall be taken in Condemnation proceedings, Lender may participate in such Condemnation proceedings. Borrower shall not adjust, contest, accept, reject or compromise any proposed Condemnation Award without approval of Lender. Lender may collect the Condemnation Award and endorse any drafts therefor. All Condemnation Awards shall be deposited with Lender. Borrower will execute any and all further documents that may be required in order to facilitate collection of any Condemnation Award and the payment of any Condemnation Award to Lender.

§10.2.    <u>Condemnation</u>. If a Condemnation shall occur and the Condemnation Conditions are not satisfied, the Net Condemnation Award received by Lender shall be applied to the payment of the Debt and/or performance of the Obligations. If a Condemnation shall occur and the Condemnation Conditions are satisfied, the Net Condemnation Award shall be held by Lender and applied and paid over toward the cost of Restoration, substantially in the same manner and subject to the same conditions as those provided in §9 hereof with respect to Net Insurance Proceeds and other monies. In the event that the costs of Restoration shall exceed the Net Condemnation Award received by Lender and made available for the Restoration, Borrower shall deposit with Lender such cash or other security as shall be satisfactory to Lender with respect to the deficiency.

§10.3.    <u>Expenses of Collection</u>. Trustee and Lender shall be entitled as a first priority to reimbursement out of any Condemnation Award for all reasonable costs and fees of, expenses incurred by, and reimbursements to, the Trustee and Lender with respect to the determination and collection of any Condemnation Award.

§10.4.    Voluntary Condemnations. Neither Borrower nor any Person controlled by or under common control with either Borrower or any Member or any General Partner, as the case may be, will obtain or exercise any power of Condemnation or eminent domain with respect to any of the Mortgaged Property, directly or indirectly, or enter into any agreement with any Person or Governmental Authority with respect to the Condemnation of any of the Mortgaged Property, without the prior written consent of Lender.

## 11.   EVENTS OF DEFAULT AND REMEDIES

§11.1.    Events of Default Defined. The occurrence of any "Event of Default" as defined in the Loan Agreement, the Related Loan Agreement or the Shores Loan Agreement shall constitute an Event of Default under this Deed of Trust.

§11.2.    Remedies Upon an Event of Default.

(a)    Acceleration of Debt. If any Event of Default described in §11.1.(o) or §11.1.(p) of the Loan Agreement shall occur, then without notice or any other action by Lender, and if any other Event of Default shall occur, then at Lender's option, the entire unpaid Debt (principal, interest and otherwise), shall become immediately due and payable without notice or demand.

(b)    Other Remedies. Upon the occurrence of any Event of Default, Lender and/or Trustee may immediately undertake any one or more of the following:

(1)    Foreclosure. Institute an action to foreclose this Deed of Trust, or take such other action as the law may allow, at law or in equity, for the enforcement thereof and realization on the Mortgaged Property, and proceed thereon to final judgment and judicial sale or execution thereon for the entire unpaid balance of the Debt, including interest at the rates and pursuant to the methods of calculation specified in the Note, together with all costs of suit, interest at the Default Rate on any judgment obtained by Lender from and after the date of any judicial sale of the Mortgaged Property until actual payment is made to Lender of the full amount due Lender, and an attorneys' reasonable fee for collection, any usage or custom to the contrary notwithstanding.

(2)    Entry. Lender personally, or by its agents or attorneys, may enter into and upon any of the Mortgaged Property and may exclude Borrower and its agents wholly therefrom without liability for trespass, damages or otherwise and Borrower agrees to surrender possession to Lender on demand after the happening of any Event of Default. Upon such an entry, Lender may: (i) use, operate, manage and control the Mortgaged Property and conduct the business thereof, either personally or by its agents or receivers and exercise all rights and powers of Borrower with respect thereto either in the name of Borrower or otherwise as Lender shall deem best; (ii) restore the Mortgaged Property; (iii) complete the construction of any Improvements under construction or renovation and in the course of such completion may make such changes in the contemplated or completed Improvements as Lender may deem desirable and may insure the same; and (iv) do all such Maintenance as to Lender may reasonably seem advisable. Lender shall be entitled to collect and receive all Rents, and after deducting the expenses of conducting the business thereof and of all necessary maintenance and amounts necessary to pay for Impositions, premiums for insurance and other proper charges upon any of the Mortgaged Property, as well as just and reasonable compensation for the services of Lender and for all attorneys and agents properly engaged and employed by Lender, Lender shall apply the remaining Rents first, to the payment of the Debt and/or performance of the Obligations, and second, to the payment of any other sums required to be paid by Borrower under any of the Loan Documents or by Related Borrower under any of the Related Loan Documents. Lender shall be liable to account only for Rents actually received by Lender.

F:\LRF\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

(3) <u>Receivership.</u> Lender may have a receiver appointed to enter into possession of the Mortgaged Property, collect the Rents and apply the same as the court may direct. Lender shall be entitled to the appointment of a receiver without the necessity of proving either the inadequacy of the security or the insolvency of Borrower or any other Person who may be liable to pay any of the Debt and/or perform any of the Obligations and Borrower and each such Person shall be deemed to have waived such proof and to have consented to the appointment of such receiver. Should Lender or any receiver collect Rents, the moneys so collected shall not be substituted for payment of the Debt nor can they be used to cure the Event of Default, without the prior written consent of Lender. Borrower hereby expressly consents to the appointment of a receiver for the Mortgaged Property upon the occurrence of any Event of Default, and waives any requirement for the posting of any bond or other security in connection with such appointment and such receiver, and for any hearing in connection with such appointment.

(4) <u>Sale of personal property.</u> Lender shall also have such rights and remedies in respect of any of the Personal Property Security and Fixtures as are provided by the Code and such other rights and remedies in respect thereof which Lender may have at law or in equity or under any of the Loan Documents, including the right to take possession of the Mortgaged Property wherever located and to sell all or any portion thereof, at public or private sale, without prior notice to Borrower, except as otherwise required by law (and if notice is required by law, after 7 days' prior written notice), at such place or places and at such time or times and in such manner and upon such terms, whether for cash or on credit, as Lender in its sole discretion may determine. Lender shall apply the proceeds of any such sale first to the payment of the reasonable costs and expenses incurred by Lender in connection with such sale or collection, including reasonable attorney's fees and legal expenses, and second to the payment of the Debt and performance of the Obligations, and then to pay the balance, if any, as required by law. Upon the occurrence of any Event of Default Borrower, upon demand by Lender, shall promptly assemble any personal property and Fixtures included in the Mortgaged Property and make it available to Lender at a place to be designated by Lender which shall be reasonably convenient to Lender and Borrower. Both Borrower and Lender shall be eligible to purchase any part or all of such property at any such disposition.

(5) <u>Power of Sale for the Mortgaged Property.</u> Lender may elect to cause any of the Mortgaged Property to be sold as follows:

(A) Lender may proceed as if all of the Mortgaged Property were real property in accordance with §11.2.(b)(5)(B) hereof, or Lender may elect to treat any of the Mortgaged Property which consists of a right in action or which is property that can be severed from the Land and Improvements without causing structural damage thereto as if the same were personal property and dispose of the same in accordance with §11.2.(b)(4), separate and apart from the sale of real property, the remainder of the Mortgaged Property being treated as real property.

(B) Should Lender request and direct Trustee to sell the Mortgaged Property or any part thereof which is real property or which Lender has elected to treat as real property, upon such election, Trustee may proceed to foreclose this Deed of Trust in respect of said real property in accordance with applicable law and otherwise in the following manner: Trustee at the request of the Lender shall proceed to take possession and following the giving of all notices required by this Mortgage or applicable law, shall sell any of the Mortgaged Property in whole or in one or more parcels, at public venue, to the highest bidder, for cash, in compliance with the provisions of Section 51.002 of the Texas Property Code. Upon such sale, Trustee shall execute and deliver a deed of conveyance of the property sold to the purchaser or purchasers thereof.

Trustee shall receive the proceeds of said sale out of which the Trustee shall pay (i) the costs and expenses of executing this trust, including lawful compensation to the Trustee for his services as provided by statute, and a reasonable attorney's fee, which shall be immediately due upon first publication of sale; (ii) to Lender, upon the usual vouchers therefor, any of the Debt, including money advanced for ground rents, Impositions, insurance, Maintenance, abstracts, title reports, judgments upon statutory lien claims and any other advances hereunder and interest thereon at the Default Rate, as herein provided; (iii) the amount unpaid on the Debt, including the interest accrued thereon at the Default Rate; (iv) the remaining Obligations; and (v) the balance of such proceeds, if any, shall be paid as required by law. The purchaser at any foreclosure sale shall not be obligated to look to the application of the proceeds thereof. If the Lender should become the purchaser, it shall be entitled to credit any of the unpaid balance of the Debt against the amount of the purchase price. The Trustee covenants faithfully to perform the Trust herein created. The purchaser at any sale or foreclosure sale hereunder may disaffirm any easement granted or lease made in violation of any provision of this Deed of Trust, and may take immediate possession of the Mortgaged Property free from, and despite the terms of, such grant of easement or lease. Borrower hereby expressly waives any right which Borrower may have to direct the order in which any of the Mortgaged Property shall be sold in the event of any sale or sales pursuant hereto. In the event of a sale or other disposition of any of the Mortgaged Property, and the execution of a deed or other conveyance pursuant thereto, the recitals in such deed or conveyance of facts, such as default, the giving of notice of default and notice of sale, terms of sale, purchaser, payment of purchase money, and any other fact affecting the regularity or validity of such sale or disposition, shall be conclusive proof of the truth of such facts; and any such deed or conveyance shall be conclusive against all persons as to such facts recited therein. In case of any sale under this Deed of Trust by virtue of judicial proceedings, or under the power of sale, the Mortgaged Property may be sold in one parcel and as an entirety or in such parcels, manner or order as Lender in its sole discretion may elect.

(C)  Lender may cause any such sale or other disposition to be conducted immediately, or Lender may delay any such sale or other disposition for such period of time as Lender deems to be in its best interest. Should Lender desire that more than one such sale or other disposition be conducted, Lender may, at its option, cause the same to be conducted simultaneously, or successively on the same day, or at such different days or times and in such order as Lender may deem to be in its best interest.

(D)  Lender, at its option, may set aside any declared acceleration of maturity of the Note, whereupon the terms and provisions therein stated and the covenants, terms and conditions in this Deed of Trust shall revive and continue with the same force and effect as if such acceleration had not occurred.

(E)  Upon the occurrence of an Event of Default hereunder, Lender in pursuance of the foregoing remedies, or in addition thereto, shall be entitled to resort to its several securities for the payment of the sums secured hereby in such order and manner as Lender may think fit without impairing Lender's lien in, or rights to, any of such securities and without affecting the liability of any Person for the Debt.

§11.3.    Waivers and Releases.

(a)  Consent to Jurisdiction, Venue, etc. Borrower hereby consents to the jurisdiction of the courts of the State of Texas in and for the County of Dallas with respect to any action, suit or other legal proceeding commenced by Lender pursuant to any of the Loan Documents, and hereby waives any right to transfer any such action to any other court.

(b)  Waiver of Redemption. Borrower hereby wholly waives the period of redemption and any right of redemption of any of the Mortgaged Property after sale under this Deed of Trust, or sale upon foreclosure of

F:\LRF\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

13

this Deed of Trust, as provided under any law of the State now or hereafter in effect. If title to any of the Mortgaged Property shall become vested in any Person who shall not waive (or who shall not be legally capable of waiving) the right of redemption in the event of foreclosure of (or sale under) this Deed of Trust, then such transfer of title shall constitute an Event of Default.

(c)     Waiver of Marshalling, etc.  Borrower, for itself and its successors in title, hereby waives all rights at law or in equity to have the Mortgaged Property marshaled in the event of the foreclosure of this Deed of Trust.  Borrower will not at any time insist upon, plead, or in any manner whatsoever claim or take any benefit or advantage of any present or future laws pertaining to the administration of the estates of decedents, exempting any of the Mortgaged Property from attachment, levy or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment, or providing for the valuation or appraisal of any of the Mortgaged Property prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court.  Borrower hereby covenants not to hinder, delay or impede the execution of any power herein granted or delegated to Lender, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted.

(d)     Waiver of Notices.  Borrower hereby waives all notices not herein elsewhere specifically required, of Borrower's default or of Lender's exercise, or election to exercise, any option or election under this Deed of Trust.

(e)     Waiver of Personal Service.  Borrower hereby waives personal service of process in any action or proceeding at any time commenced to enforce this Deed of Trust, or any of the Loan Documents, and agrees that such process shall be deemed properly and adequately served if sent to Borrower at the address provided in or pursuant to §12 hereof for the giving of notices to Borrower, by certified or registered mail, return receipt requested, in the manner provided in §12 hereof for the giving of notices to Borrower.

§11.4.     Foreclosure Subject to Leases.  In the event that Lender shall have the right to foreclose this Deed of Trust, Borrower authorizes Lender at its option to foreclose subject to the rights of any tenants, and the failure to make any such tenants parties to any such foreclosure proceeding and to foreclose their rights will not be asserted by Borrower as a defense to any proceeding instituted by Lender to collect any of the Debt or any deficiency after foreclosure.

## 12.  NOTICES

§12.1.     Addresses.  All notices, demands, requests and consents required under this Deed of Trust shall be in writing, and shall be deemed properly given:  (a) if delivered personally;  (b) if sent by United States certified or registered mail with return receipt requested;  (c) if sent by Federal Express or other overnight delivery service;  (d) if sent by facsimile transmission, confirmed by certified or registered mail with return receipt requested; or (e) if sent by telegram; in each such case (except for personal delivery), with postage or charges prepaid or billed to sender, and addressed if to Borrower at the Borrower's address hereinabove set forth, or if to the Trustee, at the Trustee's address hereinabove set forth, or if to the Lender, at the Lender's address hereinabove set forth, or at such other address or addresses as any party hereto may hereafter designate for itself by written notice to each other party hereto.

§12.2.     Manner of Delivery.  Notices, demands and requests hereunder shall be deemed sufficiently served or given for all purposes hereunder on the earlier of the date of actual receipt, or:  (a) if served by certified or registered mail, three days after the time such notice, demand or request shall be deposited for mailing in any Post Office or Branch Post Office regularly maintained by the United States Postal Service; (b)

F:\LRF\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

14

if sent by overnight delivery service, on the day following delivery thereof to such overnight delivery service; (c) if sent by facsimile transmission, with confirmation by certified or registered mail, on the date such facsimile transmission is received by the Person to whom it is sent; or (d) if sent by telegram, on the day such telegram is dispatched by Western Union or other telegraph service.

13.  NON WAIVER, ETC.

§13.1.    Waiver Not Affecting Deed of Trust.  No failure by Lender to insist upon the strict performance by Borrower of any of the provisions hereof shall be deemed to be a waiver of any of the provisions hereof, and Trustee and Lender, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Borrower of all of the provisions of this Deed of Trust. Neither Borrower nor any other Person liable for the payment of any of the Debt or the performance of any of the Obligations, nor any Person giving security for any of the Debt or for the performance of any of the Obligations, shall be relieved of any of such respective obligations, nor shall any security given by any of them be released, nor the position of any subordinate lienholder be improved, by reason of: (a) any failure by Lender to comply with any request by Borrower or of any other Person so obligated to foreclose or otherwise enforce this Deed of Trust; (b) the release, regardless of consideration, of any of the security held for payment of any of the Debt and/or the performance of any of the Obligations; (c) any agreement or stipulation between any subsequent owner or owners of the Mortgaged Property and Lender extending the time of payment or modifying the terms of the Note or any of the Loan Documents; (d) any grant of forbearance or extension of time for the payment of any of the Debt or the performance of the Obligations; (e) Lender's acceptance of any other or additional security for the payment of any of the Debt or the performance of any of the Obligations; (f) Lender's waiver of or failure to exercise any right granted herein or in any of the Loan Documents or Related Loan Documents; (g) any changes hereafter made in any of the terms, covenants, conditions or agreements of this Deed of Trust or in any other Loan Document; (h) Lender's giving of consent to the filing of any map, plat, replat or condominium declaration affecting any of the Mortgaged Property; (i) Lender's giving of consent to the granting of any easement or other right affecting the Mortgaged Property; or (j) Lender's making or consenting to any agreement subordinating the lien hereof.

§13.2.    Right to Cure Defaults.  If Borrower shall fail to fully and timely perform any of the Obligations, Lender shall be under no obligation to take action to correct such failures. However, at its option, Lender may take such action and expend such sums as Lender deems necessary to correct such failures and/or any consequences thereof. Such action or payment by Lender shall not constitute a waiver by Lender of the performance of said act, and Lender may treat Borrower's failure to perform such act as a default (and, upon expiration of any applicable grace period, an Event of Default) notwithstanding Lender's having undertaken (or completed) the performance of the act. Borrower will repay to Lender upon demand any amounts expended by Lender to correct each such failure and/or any consequences thereof, and all expenses of Lender in taking such action, with interest at the Default Rate from the incurring of such expense or the making of such payment, as the case may be. The payment of such amounts to Lender shall be secured by this Deed of Trust.

14.  GENERAL COVENANTS

§14.1.    Estoppel Certificate.  Borrower, within three (3) days upon request in person or within ten (10) days upon request by mail, will furnish a duly acknowledged written statement in form satisfactory to Lender setting forth the amount of the Debt then secured by this Deed of Trust, and stating either that no offsets or defenses exist against the Debt, or if such offsets or defenses are alleged to exist, the nature and extent thereof, and containing such other matters as Lender shall reasonably request.

F:\LRP\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

§14.2.    <u>Lender and Trustee Expenses</u>. Borrower shall promptly pay upon request all expenses and costs incurred by Lender or Trustee, including reasonable attorney's fees, together with interest thereon at the Default Rate from that date which is ten (10) days after request for payment thereof by Lender or Trustee, in connection with:

(a)    any action, proceeding, litigation or claim instituted or asserted by or against Lender and/or Trustee or in which Lender and/or Trustee becomes engaged, wherein it becomes necessary in the opinion of Lender and/or Trustee to protect Lender's or Trustee's interests in the Mortgaged Property or the security afforded hereby or by any of the Loan Documents, or to defend or uphold the Lien of this Deed of Trust, or the validity or effectiveness of any assignment of any claim, award, payment, insurance policy or any other right or property conveyed, encumbered or assigned by Borrower to Trustee or Lender under any of the Loan Documents, or the priority of any of the same;

(b)    any further assurances requested by Lender under §2.7, or any other provision hereof, including all filing and recording costs and costs of searches;

(c)    the negotiation, preparation, execution and delivery of the Loan Documents, and any amendments and supplements thereto at any time entered into;

(d)    all taxes, fees and other assessments, including stamp taxes, if any, upon any documents or transactions contemplated hereby or in connection with the recording and filing of any Loan Document;

(e)    the collection and/or enforcement of any of the Debt and/or Obligations, including realization upon any of the Mortgaged Property or other security for any of the Debt or Obligations; and

(f)    the collection and application of any insurance proceeds and Condemnation Awards.

All such expenses and costs, with interest thereon at the Default Rate as provided above, shall be added to and become part of the Debt and be secured by this Deed of Trust; provided, however, that in any action to foreclose this Deed of Trust or to recover or collect the sums due hereunder, the provisions of law and of this Deed of Trust relative to the recovery of costs, disbursements, commissions, allowances and attorneys' fees, shall prevail over any conflicting requirements of this §14.2. The provisions of this §14.2 shall survive payment of the Debt and performance of the Obligations and any release of, or reconveyance under, this Deed of Trust.

§14.3.    <u>Taxation of Deed of Trust</u>. In the event of the passage after the date of this Deed of Trust of any law deducting from the value of the Mortgaged Property for the purpose of taxation any Lien thereon, or changing in any way the laws now in force for the taxation of mortgages or deeds of trust, or debts secured thereby, so as to adversely affect the interest of Lender, then the Borrower shall bear and pay the full amount of such taxes, provided that if payment by Borrower of any such new or additional taxes would be unlawful or would render the Debt wholly or partially usurious, Lender may, at Lender's option, declare the whole sum secured by this Deed of Trust, with interest thereon, to be due and payable on a date to be specified in a written notice to Borrower, which shall be not less than 60 days after the date such notice is given.

§14.4.    <u>Amendments</u>. No provision of this Deed of Trust shall be changed, altered, modified or released except by an agreement in writing signed by Borrower and Lender. No compliance with or failure to

comply with any provision of this Deed of Trust shall be waived or excused except by a written instrument executed by Lender.

§14.5.    <u>Usury Savings Provision</u>. It is the intention of the parties to conform strictly to the Usury Laws. All agreements contained in the Loan Documents are expressly limited so that in no contingency or event whatsoever, whether by reason of the making of advances on account of the Loan, or under any of the Loan Documents, or acceleration of maturity of the unpaid principal balance of the Loan or otherwise, shall the amount paid or agreed to be paid by or on behalf of Borrower to the Lender for the use, forbearance or detention of money exceed the highest lawful rate permissible under any applicable Usury Law. If, from any circumstances whatsoever, compliance with any of the Loan Documents, at the time performance thereunder shall be due, shall involve transcending the limit of validity under any Usury Law then, <u>ipso facto</u>, the obligations to be fulfilled shall be reduced to the limit of such validity. If Lender shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due under the Note and not to the payment of interest. This provision shall control every other provision of all agreements between Borrower and Lender; provided, however, that there shall be no automatic reduction of such payments or obligations as to any party barred by law from availing itself in any action or proceeding of the defense of usury, or any party barred or exempted from the operation of any Usury Law, or in the event and to the extent the Loan, because of its amount or purpose or for any other reason, is exempt from the operation of the Usury Law. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of any of the Debt or for the Obligations outstanding from time to time shall, to the extent permitted by applicable law, and to the extent necessary to preclude exceeding the limit of validity prescribed by law, be amortized, prorated, allocated and spread from the earliest date of disbursement of any of the proceeds of the Note until payment in full of the principal balance of the Debt and the Obligations so that the actual rate of interest on account of such Debt and Obligations is uniform throughout such term.

§14.6.    <u>Accounting; Financial Statements</u>.

(a)    <u>Books and Records</u>.  Borrower will keep, and cause Guarantors to keep, adequate records and books of account in accordance with generally accepted accounting or tax accounting principles and will permit Lender, by its agents, accountants and attorneys, to visit and inspect the Mortgaged Property and examine and make copies or extracts from Borrower's and Guarantors' records and books of account and to discuss Borrower's and Guarantors' affairs, finances and accounts with Borrower, its officers, members, partners, agents and employees.

(b)    <u>Financial Statements</u>.  Borrower and each of the Guarantors shall deliver to Lender with reasonable promptness (and in any event within 45 days upon request) any and all financial statements that the Lender may request in its reasonable discretion. Each financial statement of Borrower shall be certified as true, complete and accurate by a General Partner of Borrower, prepared in accordance with generally accepted accounting or tax accounting principles. Each of the Guarantors will deliver to Lender by April 1 of each year a balance sheet and income statement for such Guarantor, prepared in accordance with accounting principles acceptable to Lender. Each financial statement of a Guarantor shall be certified as true, complete and accurate by the Guarantor whose statement it is.

(c)    <u>Other Information</u>.  Throughout the term of this Deed of Trust, Borrower and the Guarantors, with reasonable promptness, will deliver such other information with respect to Borrower, the General Partner, the Mortgaged Property and the Guarantors as Lender may request from time to time.

§14.7. Subrogation. Lender shall be subrogated, notwithstanding their release of record, to any Liens, superior titles, rights, equities and charges of all kinds heretofore or hereafter existing on the Mortgaged Property to the extent that the same are paid or discharged from the proceeds of the Loan or are otherwise paid by Lender.

§14.8. Lost Note. If the Note shall be mutilated, destroyed, lost or stolen, Borrower will deliver to Lender in substitution therefor a new promissory note containing the same terms and conditions as the Note with a notation thereon of the unpaid principal and accrued but unpaid interest. Borrower shall be furnished with reasonably satisfactory evidence of the mutilation, destruction, loss or theft of the Note, and also such security or indemnity as may be reasonably requested by Borrower; provided, however, that if the Lender is a bank, a life insurance company, a savings and loan association or other financial institution whose loans are regulated by an agency of the state of its domicile, an unqualified indemnity from the Lender shall be deemed to be satisfactory security and indemnification.

§14.9. Application of Moneys. Whenever in this Deed of Trust Lender is to apply, or shall elect to apply, any sum of money to payment of any of the Debt, or to performance of any of the Obligations, Lender may so apply such sums to principal, interest, costs and expenses, or otherwise, all in such order of priority as Lender may elect, unless a different order of priority is required by applicable law.

§14.10. Lender Not Liable; Indemnity. Except to the extent resulting from Lender's gross negligence or willful misconduct, neither Trustee nor Lender shall be responsible or liable in any way for any condition in or upon any of the Mortgaged Property (whether or not discovered by Lender), including any condition relating to the presence on the Mortgaged Property of any Hazardous Substance, or any defects in any of the Mortgaged Property or any personal injury, death, damage to property, loss, cost, liability, damage or expense in any way arising out of or connected with the construction or maintenance of any of the Mortgaged Property or any construction or other work thereon, or Borrower's use and occupancy of the Mortgaged Property. Borrower will indemnify, defend and hold Lender and the Trustee harmless from and against all such liability and responsibility. The provisions of this §14.10 shall survive the payment of the Debt, performance of the Obligations, release of this Deed of Trust and the reconveyance of the Mortgaged Property.

## 15. TRANSFER OF MORTGAGED PROPERTY

§15.1. Restrictions Upon Transfer. Lender has made the Loan in reliance in part upon the management and development skills of Borrower. Accordingly, without the prior written approval of Lender, Borrower, except as may be permitted by §15.2 hereof, shall not allow or permit any Transfer to occur; and any such prohibited act shall be an Event of Default.

§15.2. Permitted Transfers. Anything to the contrary in §15.1 of this Deed of Trust notwithstanding, Transfers of partnership interests in Borrower, and Transfers of partnership interests in any partner of or any ownership interest (direct or indirect) in any Person which is a shareholder, partner, member or other owner of an interest in Borrower shall not constitute an Event of Default under §15.1 of this Deed of Trust; provided, however, Jeff Silverstein shall not be permitted to make any Transfer of any interest which he holds directly or indirectly in Borrower. Lender shall have the right to condition its consent to any other Transfer prohibited by §15.1 hereof upon the payment of a fee or charge and/or upon an increase in the rate of interest and/or changes in the other provisions of any of the Loan Documents. References in this Deed of Trust to proceeds of any of the Mortgaged Property are not intended as a consent to, and do not authorize, any Transfer of any of the Mortgaged Property.

## 16. CONCERNING THE TRUSTEE

§16.1.    Duties and Obligations of Trustee.  Borrower agrees that:  (a) the duties and obligations of Trustee shall be determined solely by the express provisions of this Deed of Trust and applicable law, Trustee shall not be obligated to perform any duties except those specifically set forth herein, and no implied covenants or obligations shall be imposed upon Trustee; (b) no provision of this Deed of Trust shall require Trustee to expend or risk its own funds, or otherwise incur any financial obligation in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers; (c) Trustee may consult with counsel of its own choosing and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in good faith and in reliance thereon; and (d) Trustee shall not be liable for any action taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Deed of Trust.  Trustee hereby agrees with Lender that Trustee will act for a nominal consideration in routine matters (e.g., execution of partial release of security, extension agreements, modification agreements or satisfactions) with respect to this Deed of Trust.  In the event of foreclosure, Trustee will serve for a Trustee's commission in an amount to be agreed upon and mutually satisfactory to Trustee and to Lender.  If Lender determines that there shall be a substitute Trustee for any reason, or for no reason, Trustee will supply a recordable resignation at the request of Lender.  Trustee shall also have the right to resign hereunder at any time by written notice of resignation given to Lender and Borrower.

§16.2.    Successor Trustee.  Except as may be prohibited by law, the Lender is hereby granted full power at any time to appoint a successor or substitute Trustee by instrument properly executed, acknowledged and filed for record in the office where this Deed of Trust is to be recorded for any reason satisfactory to Lender, and such successor or substitute Trustee, from and after the making of such appointment, shall have and possess all of the powers, authorities, duties and obligations vested in and upon the Trustee designated in this Deed of Trust.  The authority hereby granted shall extend to the appointment of other successor and substitute trustees successively until the Debt has been fully paid and the Obligations fully performed.

§16.3.    Indemnity to Trustee.  Borrower shall indemnify, defend and hold the Trustee harmless, from and against any and all loss, damage, liability, cost and expense, including reasonable attorney's fees, suffered or incurred by Trustee in connection with any act or omission to act of Trustee under this Deed of Trust, and in connection with any action or proceeding in which Trustee shall be made a party or shall join, relating to any of the Mortgaged Property, this Deed of Trust, or any of the transactions contemplated by the Loan Documents.  The provisions of this §16.3 shall survive payment of the Debt, performance of the Obligations, and the release of this Deed of Trust and reconveyance of the Mortgaged Property.

## 17. FUTURE ADVANCES

§17.1.    Future Advances.  In addition to the indebtedness evidenced by the Note and Related Note and all other Debt, this Deed of Trust, to the fullest extent permitted by the law of the State, shall secure also and constitute a Lien on the Mortgaged Property for all future advances made by Lender to Borrower under the Loan and to Related Borrower under the Related Loan and future obligations incurred by Borrower and Related Borrower to Lender in connection with the Mortgaged Property, Related Property, the Loan or the Related Loan to the same extent as if such future advances were made or such future obligations incurred on the date of the execution of this Deed of Trust.

## 18.  ENVIRONMENTAL MATTERS

§18.1.    Environmental Covenants.  Borrower hereby covenants and agrees with Lender as follows:

(a)   At all times until this Deed of Trust has been satisfied of record, the Mortgaged Property and the use and operation of the Mortgaged Property shall comply with all Environmental Laws, all governmental permits, approvals and licenses required with respect to the Mortgaged Property by any Environmental Laws shall be and remain in effect, and Borrower shall comply therewith.  Any Hazardous Substance at any time present, handled or generated on the Mortgaged Property shall be disposed of in strict compliance with all Environmental Laws.  Without limiting the foregoing, Borrower shall not allow or permit any Hazardous Substance to exist or be stored, located, discharged, manufactured, possessed, managed, processed or otherwise handled on the Mortgaged Property at any time, except in strict compliance with all applicable Environmental Laws.

(b)   To the best of Borrower's knowledge, there are no underground storage tanks or above-ground storage tanks presently on the Mortgaged Property, except as previously disclosed in writing to Lender, including in the Phase I Environmental Site Assessment delivered to Lender by Borrower.  Borrower will not place or allow any underground storage tanks or above-ground storage tanks to be placed on the Mortgaged Property while this Deed of Trust remains in effect, except in strict compliance with all applicable Environmental Laws.

(c)   Except for Borrower's use of Hazardous Substances in the ordinary course of Borrower's business in compliance with Environmental Laws, Borrower shall immediately notify Lender should Borrower become aware of any Hazardous Substance on, in, or under the Mortgaged Property, and any other environmental problem or liability with respect to the Mortgaged Property.  Borrower shall immediately notify Lender and provide copies upon receipt of all written complaints, claims, citations, demands, inquiries, reports or notices relating to the condition of the Mortgaged Property or its compliance with Environmental Laws.  Borrower shall use its best efforts to promptly cure and have dismissed with prejudice any such actions and proceedings to the satisfaction of Lender.  Borrower shall keep the Mortgaged Property free of any lien imposed pursuant to any Environmental Laws.

(d)   Borrower shall not do or take any action or omit or fail to take any action which will result in the unauthorized release of any Hazardous Substance or the existence of any environmental contamination in, on, under or with respect to, any of the Mortgaged Property.

(e)   Failure of Borrower to comply with all Environmental Laws and governmental safety requirements (subject to the notice and cure rights in Section 11.1) shall be a default under this Deed of Trust and Lender, in addition to all the other rights and remedies available to Lender, shall have the option to require specific performance of Borrower's obligations hereunder.

(f)   In the event that there shall be filed a lien against the Mortgaged Property by any Governmental Authority, arising from an intentional or unintentional action or omission of Borrower and resulting in the releasing, spilling, pumping, pouring, emitting, emptying or dumping of any Hazardous Substance, then Borrower shall, within sixty (60) days after the date that Borrower is given notice that the lien has been placed against the Mortgaged Property or within such shorter period of time in the event that the holder of such lien has commenced steps to cause the Mortgaged Property to be sold pursuant to the lien, either (A) pay the claim and remove the lien from the Mortgaged Property, or (B) furnish a cash deposit or a bond satisfactory to Lender in the amount of the claim out of which the lien arises, or other security reasonably satisfactory to

Lender in an amount sufficient to discharge the claim out of which the lien arises. Notwithstanding any other provision of this Deed of Trust, any default by Borrower under this §18.1.(f) which continues beyond the end of said sixty (60) day period, time being of the essence, shall be an Event of Default under this Deed of Trust.

(g)  If any Governmental Authority serves upon Borrower a directive to remove or arrange for the removal or discharge of any Hazardous Substance in, under or on the Mortgaged Property, Borrower agrees that the repayment of the Loan may, at Lender's election, be accelerated unless Borrower shall have complied with such directive within thirty (30) days from its date, time being of the essence, to the satisfaction of the Governmental Authority involved; provided, however, that if such directive is of such a nature that it can be cured by Borrower, but cannot be cured within thirty (30) days, Borrower shall have such additional time to cure such directive as may be necessary (but in no event to exceed a total of ninety (90) days, including such thirty (30) day period), if Borrower commences to cure such directive within said thirty (30) day period and thereafter pursues such cure with diligence and continuity to completion.

(h)  Promptly following completion of any actions imposed upon any Borrower under any Environmental Laws, Borrower shall obtain and deliver to Lender certifications of environmental consultants acceptable to Lender, in form and substance satisfactory to Lender, stating that all action required by any Environmental Law has been taken, and that upon completion of such action, the Mortgaged Property, to the knowledge of such professional, is then in compliance with the applicable Environmental Laws.

(i)  Borrower shall promptly after obtaining knowledge thereof advise Lender in writing of (i) any governmental or regulatory actions instituted or threatened in writing under any Environmental Laws affecting the Mortgaged Property or any Indemnity hereunder including, without limitation, any notice of inspection, abatement or noncompliance, (ii) all claims made or threatened in writing by any third party against Borrower or the Mortgaged Property relating to any Hazardous Substance or to any alleged violation of an Environmental Law, and (iii) Borrower's discovery of any occurrence or condition on the Mortgaged Property or any real property adjoining or in the vicinity of the Mortgaged Property which could subject Borrower or the Mortgaged Property to a claim under any Environmental Law or to any restrictions on ownership, occupancy, transferability or use of the Mortgaged Property under any Environment Law. Borrower shall deliver to Lender all such documentation and records relating to any matter, notice of which is required by this §18.1, as Lender may reasonably request.

§18.2.    Indemnities.  Except to the extent resulting from Lender's gross negligence or willful misconduct, Borrower shall indemnify, defend, and hold the Lender harmless from and against any and all Environmental Claims that are asserted at any time against the Lender or the Mortgaged Property, and any and all losses, liabilities, damages, expenses (including reasonable attorneys' fees and disbursements), that Lender suffers or incurs as a result of any such Environmental Claim or the assertion of any such Environmental Claim (whether such Environmental Claim is meritorious or not).  The provisions of this §18.2 shall survive the payment of the Debt, the performance of the Obligations and the release and satisfaction of this Deed of Trust.

§18.3.    No CERCLA Claim Against Lender.  Except to the extent resulting from Lender's gross negligence or willful misconduct, Borrower hereby waives, releases and agrees not to make any claim or bring any cost recovery action against Lender under the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.), as now and hereafter amended ("CERCLA") or any state equivalent, or any similar law now existing or hereafter enacted, nor for contribution or indemnity from Lender.

§18.4.    No Control of Borrower by Lender.  Borrower hereby acknowledges and agrees that Lender has not participated in the management of Borrower and that any indicia of ownership which Lender may have in and to the Mortgaged Property by virtue of this Deed of Trust and the other Loan Documents (and the rights granted to Lender therein) is primarily to protect Lender's security interest and lien in and to the Mortgaged Property.

§18.5.    Right to Inspect, etc.  Lender, in person or by agent, shall have the right, but not the obligation, at any time and from time to time to enter upon the Mortgaged Property, take samples, review Borrower's books and records, interview Borrower's employees and officers, and conduct similar activities to ascertain the status of Borrower's compliance with this §18. Borrower shall cooperate in the conduct of such an audit.  Such entry may be made at any time or times upon not less than 48 hours written notice to Borrower.  In addition, Lender may have tests (which may include drilling and sampling, among other things) and audits of the Mortgaged Property done for the purpose of testing for evidence of noncompliance.  If at the time such tests or audits are done, Borrower is in default under any provision of this Deed of Trust, or an Event of Default exists, or if such tests or audits done at any time show that Borrower is not in compliance with this §18, then all of Lender's costs, fees and expenses incurred in connection with such tests and audits shall be paid for by the Borrower.  If at the time such tests or audits are done, Borrower is not in default under any provision of this Deed of Trust, no Event of Default exists, and such tests or audits show that Borrower is in compliance with this §18, then all of Lender's costs, fees and expenses incurred in connection with such tests and audits shall be at Lender's expense.

19.  DEFINITIONS, CONSTRUCTION AND INTERPRETATION.

§19.1.    Governing Law.  Notwithstanding that the Note is governed by the laws of the State of Kansas, this Deed of Trust shall be construed and enforced in accordance with the internal laws (without regard to the conflict of laws rules) of the State of Texas.  Notwithstanding anything to the contrary contained in this Deed of Trust or in any other document described herein, Borrower expressly consents to jurisdiction in the courts and laws of the State of Texas, and consents to the applicability of the laws of the State of Texas, with respect to any personal liability and any action for a deficiency judgment, whether before or after any exercise of a power of sale or any judicial foreclosure.

§19.2.    Successors and Assigns.  All of the grants, obligations, covenants, agreements, terms, provisions and conditions herein shall run with the Land, and shall apply to, bind and inure to the benefit of, the successors of Borrower and any subsequent owner of the Land or the Improvements, and the successors of Lender and any subsequent holder of the Note.

§19.3.    Provisions Severable.  If any term or provision of this Deed of Trust or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed of Trust, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Deed of Trust shall be valid and be enforced to the fullest extent permitted by law.

§19.4.    Multiple Counterparts.  This Deed of Trust may be executed in any number of counterparts and by the parties hereto on different counterparts.  Each such counterpart shall for all purposes be deemed to be an original and all such counterparts shall together constitute but one and the same Deed of Trust.

§19.5.    Other Interpretive Provisions.  As used herein, the following words and phrases shall have the following meanings: (i) "including" shall mean "including but not limited to"; (ii) "provisions" shall mean

F:\LRF\BJM\Clients\Hilcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

"provisions, terms, covenants and/or conditions"; (iii) "<u>any of</u>" shall mean all or any part of or interest in that with respect to which such phrase is used.

§19.6.   <u>Miscellaneous Provisions.</u>   Whenever used herein, the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to all genders. If any provision of this Deed of Trust shall conflict with any provision of any other Loan Document, the provision of the document which shall enlarge the interest of the Lender in the Mortgaged Property, afford the Lender greater financial security in the Mortgaged Property and/or assure payment of the Debt and performance of the Obligations in full, shall control. Except as otherwise expressly stated herein, with respect to any matters which, under this Deed of Trust, Lender shall have the right to approve, consent to, be satisfied with, exercise its judgment with regard to or calculate, the decisions of Lender with respect to such matters shall be made in the sole discretion of Lender, may be given or withheld without regard to reasonableness, and shall be final and conclusive. The headings and captions in this Deed of Trust are for convenience only, and are not to be construed as defining or limiting in any way the scope or intent of the provisions of this Deed of Trust. The granting of consent by Lender to any matter as to which such consent is required by the provisions hereof shall not be deemed a waiver of the right to require consent to future or successive matters. If any of the Mortgaged Property could, under applicable law, be treated either as personal property or as a part of the real estate, or if it is unclear whether such property is real property or personal property, it is the intention of Borrower and Lender that such property be treated for all purposes hereunder as real estate. Each of the parties have participated in the negotiation and preparation of this Deed of Trust, with the advice of counsel, and this Deed of Trust shall not be construed against any party by reason of that party having prepared the initial draft, or subsequent versions, of this Deed of Trust.

§19.7.   <u>Definitions.</u>   As used herein, each of the following terms shall have the meaning indicated below, unless the context clearly requires otherwise:

"Borrower" shall mean Oakridge Golf Club, L.P., a Texas limited partnership, its successors and assigns permitted under the Loan Documents.

"Casualty" shall mean any damage, destruction, or loss to or of any of the Mortgaged Property resulting from fire, any peril insured against, or any other cause except a Condemnation.

"Condemnation" shall mean any condemnation or taking of any of the Mortgaged Property or the use thereof by any Governmental Authority or other Person pursuant to the power of eminent domain or condemnation, and any conveyance of any of the Mortgaged Property in lieu of condemnation.

"Condemnation Award" shall mean any and all awards, damages and other sums of money at any time owed or becoming payable, or paid, with respect to any Condemnation, including any payments for any conveyance in lieu of Condemnation, and awards for changes of grade of any streets.

"Condemnation Conditions" shall mean (i) that the Mortgaged Property can be restored to a condition in which the value thereof will not be materially less than before the Condemnation and (ii) that Borrower has satisfied conditions reasonably imposed by Lender to use the portion of the Net Condemnation Award made available to the Borrower for Restoration.

"Debt" shall mean (i) all indebtedness of Borrower evidenced by the Note, including principal, interest, additional interest if any, late charges, and interest after default, (ii) any and all extensions, renewals, refinancings or refundings thereof in whole or in part, whether or not now provided for in the Loan Docu-

ments, (iii) all costs and expenses incurred by Lender in the collection of any of such indebtedness, including attorneys' fees and legal expenses, (iv) all future advances made by Lender for the protection or preservation of any of the Mortgaged Property, (v) all other amounts coming due to Lender under any provision of any of the Loan Documents, and (vi) the Related Debt.

"Default Rate" shall mean the "Default Rate" as defined in the Note.

"De Minimus Proceeds Amount" shall mean $10,000.00.

"Environmental Claims" shall mean any and all claims, demands, actions or causes of action that are asserted at any time against Lender, Borrower or any of the Mortgaged Property, which directly or indirectly relate to or arise from any activities (which includes both actions and omissions to act) which occur prior to the earlier of: (i) the first date on which all the Debt has been paid, and all the Obligations performed, and the Lender's obligation to make further disbursements of proceeds of the Loan (and to pay drafts under any letter of credit, reimbursement for draws under which is required and/or secured by any of the Loan Documents) has terminated; or (ii) the date on which Borrower's title to the Land and Improvements is transferred through foreclosure (judicially or by power of sale) of this Deed of Trust or by deed in lieu thereof.

"Environmental Law" shall mean, collectively, CERCLA, the Hazardous Materials Transportation Act (49 U.S.C. Section 1802 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. Section 300f et seq.), the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), the Clean Air Act (42 U.S.C. Section 7401 et seq.), and all other federal, state or local statutes, ordinances, codes, rules, regulations, judgments, orders and decrees regulating, relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material as now or at any time hereafter in effect, each as now or hereafter amended, and all permits, licenses, authorizations, concessions, grants, franchises, agreements or other governmental restrictions or requirements relating to the protection of the environment or to any Hazardous Substance.

"Escrow Date" shall mean: (a) when used in relation to real estate taxes and assessments on the Mortgaged Property, the thirtieth (30th) day before any of such taxes and assessments are first due and payable in each year; and (b) when used with respect to insurance premiums, the thirtieth (30th) day before such premiums are due.

"Event of Default" shall mean an Event of Default as defined in §11.1 hereof, and any event, omission or circumstance otherwise specifically stated in this Deed of Trust to be an Event of Default.

"Forfeiture Law" shall mean all federal or state laws, including without limitation, the Racketeer Influenced and Corrupt Organizations Act of 1970, as now or hereafter amended, which provide for any forfeiture of assets as a potential penalty.

"General Partner" shall mean any general partner of Borrower.

"Guarantors" shall mean Jeffrey M. Silverstein, the Silverstein Living Trust and any other Person who may at any time guarantee to Lender the payment of any of the Debt and/or the performance of any of the Obligations.

"Guaranty" shall mean that certain Guaranty Agreement of even date herewith given by the Guarantors to Lender as security for the payment of the Debt and/or the performance of any of the Obligations, and any amendments thereto made at any time.

"Hazardous Substance" shall mean: (a) any "hazardous substance" as such term is presently defined in CERCLA; (b) any additional substances or materials which are hereafter incorporated in or added to the definition of "hazardous substance" for the purposes of CERCLA; (c) any element, substance, compound or mixture, including disease-causing agents, now or hereafter designated as, or containing components designated as, hazardous, dangerous, toxic, harmful, and/or subject to regulation by any Environmental Law, including asbestos in any form and any substance containing asbestos, mold, urea formaldehyde foam insulation, transformers or other equipment which contains dielectric fluid or polychlorinated biphenyls, flammable explosives, radioactive materials, chemicals known to cause cancer or reproductive toxicity, pollutants, effluents, contaminants, emissions or related materials and any waste, substance or material now or hereafter regulated by any Environmental Law; and (d) any radioactive material, including any source, special nuclear or by-product material as defined at 42 U.S.C. Section 2014, as now or hereafter amended.

"Land" shall mean all of the real property and interests in real property described on Exhibit A attached to and incorporated into this Deed of Trust.

"Leases" shall mean all agreements for use and occupancy of any part of the Mortgaged Property, now existing or hereafter entered into, including all present and future leases (including subleases), licenses, concessions, rights in respect of tenants holding over and tenancies following attornment, and all extensions, modifications, renewals or supplements to any lease, license or concession, and all cash or securities deposited with the Borrower to secure performance of the tenant's obligations under such Lease.

"Legal Requirements" shall mean collectively (i) all present and future laws, ordinances, orders, rules, regulations and requirements of all Governmental Authorities, including those with respect to zoning, subdivision, building, safety, fire protection, wetlands protection, historical preservation, access for the handicapped or disabled, ecological or environmental matters; and (ii) all covenants, restrictions and conditions now or hereafter of record which may apply to any of the Mortgaged Property or the use, occupancy, possession, Maintenance, Restoration or enjoyment thereof.

"Lien" shall mean any mortgage, deed of trust, security agreement, financing statement, security interest, judgment lien, mechanic's or materialman's lien, any other lien, encumbrance, charge, retention or reservation of title as security, pledge, hypothecation or assignment as security, of any of, or upon, the Mortgaged Property, whether now existing or hereafter created, suffered or incurred.

"Loan" shall mean the loan in the maximum aggregate principal amount of $4,000,000.00 made by Lender to Borrower pursuant to the Loan Agreement.

"Loan Agreement" shall mean that certain Loan Agreement dated the date hereof between Borrower and Lender, and any amendments, extensions and supplements thereto made at any time.

"Loan Documents" shall mean collectively the Loan Agreement, the Note, this Deed of Trust, the Guaranty, financing statements to evidence security interests securing the Loan, and all other instruments, documents and agreements now or hereafter evidencing, securing or supporting any of the Debt or the Obligations, and any amendments, extensions and supplements to any of them made at any time.

"Maintenance" shall mean all repairs, renewals, replacements, alterations, additions, betterments and improvements to the Mortgaged Property (whether interior or exterior, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen), that are necessary to keep the Mortgaged Property in good order, condition and repair, consistent with the standard described in §5.2 and suitable for the Permitted Uses.

"Maturity Date" shall mean the Maturity Date set forth in the Note, as the same may be extended pursuant to the provisions thereof.

"Mortgaged Property" shall mean collectively all the property and interests, tangible and intangible, described or referred to in §§1.1, 1.2 and 1.3 hereof, whether now owned or hereafter acquired by Borrower.

"Net Condemnation Award" shall mean a Condemnation Award, less the costs and expenses, including reasonable attorney's fees, incurred by Lender and/or Trustee in connection with such Condemnation Award and the Condemnation to which it relates.

"Net Insurance Proceeds" shall mean all of the proceeds and sums of money owed or becoming due or paid under any policy of insurance upon any of the Mortgaged Property, including any sums paid in settlement of any claim under any such insurance policy, less the costs and expenses, including reasonable attorney's fees, incurred by Lender and/or Trustee in connection with such insurance proceeds and the Casualty to which they relate.

"Note" shall mean that certain Promissory Note of even date herewith made by Borrower, payable to Lender or its order, in the principal amount of $4,000,000.00, bearing interest as in the Note specified, containing an attorney's fees clause, with interest and principal payable as in the Note specified, maturing on the Maturity Date, and any amendments, extensions and supplements thereto made at any time.

"Obligations" shall mean collectively: (a) the obligation to pay the Debt, (b) all obligations of Borrower to Lender arising from or out of any of the Loan Documents, and (c) all obligations of Related Borrower to Lender arising from or out of any of the Related Loan Documents.

"Permitted Encumbrances" shall mean only those matters listed as exceptions to coverage on Schedule B to the Lender's policy of title insurance insuring the lien of this Deed of Trust; except that those matters which are listed in said policy as matters which are subordinate to the lien of this Deed of Trust shall be included as "Permitted Encumbrances" only as matters which are so subordinate, and notwithstanding any provision of any of the Loan Documents seemingly to the contrary, none of the Loan Documents shall be subject to such items so listed as subordinate.

"Person" shall mean an individual, corporation, general partnership, limited partnership, limited liability company, unincorporated association, trust or any other legal entity.

"Related Borrower" shall mean Los Rios Golf Course, L.P., a Texas limited partnership.

"Related Debt" shall mean (a) all indebtedness of Related Borrower evidenced by the Related Note, including principal, interest, additional interest, if any, late charges, and interest after default, (ii) any and all extensions, renewals, refinancings or refundings thereof in whole or in part, whether or not now provided for in the Related Loan Documents, (iii) all costs and expenses incurred by Lender in the collection of any of such indebtedness, including attorneys' fees and legal expenses, (iv) all future advances made by Lender for the

protection or preservation of any of the Related Property, and (v) all other amounts coming due to Lender under any provision of any of the Related Loan Documents.

"Related Loan" shall mean the loan made by Lender to Related Borrower on or about the date hereof in the maximum aggregate principal amount of $3,750,000.00, and subject to Lender's review and approval of title, survey, environmental conditions and other matters relating to such loan.

"Related Loan Agreement" shall mean that certain Loan Agreement made by and between Related Borrower and Lender, in conjunction with the Related Loan, and any amendments, extensions and supplements thereto made at any time.

"Related Loan Documents" shall mean any loan agreement which evidences the Related Loan, the promissory note which evidences the Related Loan, the mortgage securing the Related Loan, financing statements and any other documents necessary or appropriate to perfect the security interests created by such mortgage and other Related Loan Documents, and each other instrument, document or agreement which shall evidence, secure or support the Related Loan, and any amendments and supplements to any of the same.

"Related Mortgage" shall mean the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing by Related Borrower in favor of Lender, encumbering certain real property in Plano, Collin County, Texas, and securing the Related Loan.

"Related Note" shall mean the Promissory Note made by Related Borrower in conjunction with the Related Loan in the maximum principal amount of $3,750,000.00 to the order of Lender, as amended, modified, supplemented, replaced, exchanged, extended, renewed, increased, refunded or restated from time to time.

"Related Property" shall mean, collectively, all the property and interests, tangible and intangible, which shall be described or referred to in §§1.1, 1.2 and 1.3 of the Related Mortgage, whether now owned or hereafter acquired by the Related Borrower.

"Rents" shall mean: all rentals, security deposits, reimbursements and other sums of money now or hereafter due to Borrower under any Lease; all of the rents, issues, profits, royalties, income, receipts, revenues and earnings now or hereafter due Borrower under any Lease or arising from the use and enjoyment of any of the Mortgaged Property; all damages for default by any party under any Lease; all proceeds of any policy of insurance covering loss of rents or business interruption resulting from any Casualty; all rights of Borrower to collect and recover any of such amounts; and the proceeds of all such Rents.

"Restoration" shall mean the restoration, repair, rebuilding, alteration and/or replacement of any of the Mortgaged Property made necessary by any Casualty or Condemnation, to a condition as nearly as possible to its condition prior to such Casualty or Condemnation (but with such changes as Borrower may make pursuant to §7.1 hereof), and includes demolition, temporary repairs and the protection of the Mortgaged Property pending the completion of Restoration.

"Shores Loan" shall mean the loan made by Lender to Shores Properties, L.P. on October 31, 2004 in the aggregate principal amount of $4,150,000.00.

"Shores Loan Agreement" shall mean that certain Loan Agreement dated October 31, 2004, by and between Borrower and Lender, in conjunction with the Shores Loan, as amended by that certain First

F:\LRF\BJM\Clients\Hillcrest\Oakridge\Loan Docs\Deed of Trust - Oakridge.v1.doc

Modification of Loan Agreement and Other Loan Documents dated the date hereof by and among Borrower, Jeffrey M. Silverstein and Lender, and any additional amendments, extensions and supplements thereto made at any time.

"State" shall mean the State of Texas.

"Transfer" shall mean: (a) with respect to Borrower's interest in the Mortgaged Property, any sale, assignment, lease, transfer or conveyance (whether voluntarily, involuntarily, by operation of law or otherwise) of any of Borrower's interest in the Mortgaged Property, or any agreement by Borrower to do any of the same; and (b) with respect to any ownership interest (whether stock, partnership interest, membership interest or otherwise) of any Person in Borrower, or any ownership interest (direct or indirect) in any Person which is a shareholder, partner, member or other owner of an interest in Borrower, any sale, assignment, conveyance, transfer, grant of a security interest in or encumbrance of any of such interest, or any agreement by any such Person to do so.

"Usury Law" shall mean any law or regulation of any Governmental Authority having jurisdiction, limiting the amount of interest that may be paid for the loan, use or detention of money and applicable to the Debt and/or any of the Obligations.

## 20. WAIVER OF TRIAL BY JURY

§20.1.    Waiver of Trial By Jury.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, LENDER, BORROWER AND THE TRUSTEE IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY COURT IN ANY ACTION: (A) LENDER OR THE TRUSTEE BRINGS TO COLLECT AMOUNTS OWED UNDER OR SECURED BY THIS DEED OF TRUST; (B) ALLEGING THAT (I) LENDER OR THE TRUSTEE OR BORROWER HAS BREACHED THIS AGREEMENT OR ANY AGREEMENT SECURED BY THIS AGREEMENT, (II) LENDER, THE TRUSTEE OR BORROWER HAS BREACHED ANY OTHER AGREEMENT, EXPRESS OR IMPLIED, (III) LENDER OR THE TRUSTEE OR ANY OF LENDER'S OR THE TRUSTEE'S OFFICERS, EMPLOYEES OR AGENTS HAVE ACTED WRONGFULLY, NEGLIGENTLY OR OTHERWISE TORTIOUSLY WITH RESPECT TO BORROWER; OR (C) TO WHICH BORROWER, LENDER AND/OR THE TRUSTEE ARE PARTIES. THIS WAIVER OF TRIAL BY JURY DOES NOT WAIVE EITHER BORROWER'S, THE TRUSTEE'S OR LENDER'S RIGHT TO BRING A LAWSUIT THAT A JUDGE, WITHOUT A JURY, WOULD DECIDE.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, Borrower has executed this Deed of Trust as of the day and year first above written.

BORROWER:

**OAKRIDGE GOLF CLUB, L.P.,**
a Texas limited partnership

> By:    IRI Golf Management, L.P.,
> a Delaware limited partnership,
> Managing General Partner

> By:    GolfMark Corporation,
> a Delaware corporation,
> General Partner

> By:    _____
> Name:  Jeffrey M. Silverstein
> Title:   President

STATE OF California )
                                    ) ss:
COUNTY OF San Diego )

On this 9th day of January____, 2006, before me, a Notary Public in and for said County and State, personally appeared Jeffrey M. Silverstein, to me personally known, who, being by me duly sworn (or affirmed), did say that he is the President of GolfMark Corporation, a Delaware corporation and the General Partner of IRI Golf Management, L.P., a Delaware limited partnership and the Managing General Partner of Oakridge Golf Club, L.P., a Texas limited partnership, and that said instrument was signed on behalf of said corporation and limited partnerships by authority of their members and partners, and said person acknowledged said instrument to be the free act and deed of said corporation and limited partnerships.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year last above written.

_____
Notary Public

My Commission Expires:

> MARCIA SIMPSON JAHELKA
> Commission # 1395586
> Notary Public - California
> San Diego County
> My Comm. Expires Feb 18, 2007

**EXHIBIT A**
**LEGAL DESCRIPTION**

TRACT A

BEING a 57.6475 acre tract of land, situated in the WILLIAM CRITTENDON SURVEY, ABSTRACT NO. 334, City of Garland, Dallas County, Texas and being all that certain tract of land referred to as Tract A, conveyed from National Golf Operating Partnership L.P., a Delaware limited partnership to Oakridge Golf Club L.P., a Texas limited partnership by deed recorded in Volume 2002030, Page 03443, of the Deed Records of Dallas County, Texas, and being more particularly described as follows:

COMMENCING at the point of projection of the intersection of the South line of Belt Line Road (a 100 foot R.O.W.) and the East line of Jupiter Road (a 100 foot R.O.W.), an "X" found in concrete pavement;

THENCE South 86 degrees 18 minutes 35 seconds East, along the projection of said Belt Line Road South line, a distance of 15.00 feet to a P.K. nail found in the top of a guard rail post, same being the POINT OF BEGINNING of the following tract of land;

THENCE South 86 degrees 18 minutes 35 seconds East, a distance of 1055.48 feet along said Belt Line Road South line, to the Northwest corner of OAKRIDGE NO. 2, an addition to the City of Garland, according to the plat thereof recorded in Volume 81004, Page 3272, Map Records, Dallas County, Texas, a 1/2 inch iron rod found 7.8 feet off the back of curb;

THENCE Along the Westerly line of said OAKRIDGE NO. 2, the following:

South 20 degrees 59 minutes 34 seconds East, a distance of 115.00 feet to a 3/8 inch iron rod found at corner;

South 39 degrees 59 minutes 34 seconds East, a distance of 594.04 feet to a 1/2 inch iron rod found at corner;

North 82 degrees 29 minutes 49 seconds East, a distance of 126.33 feet to a P.K. nail found in transformer box at corner;

South 85 degrees 54 minutes 04 seconds East, a distance of 85.07 feet to a point on the Westerly line of Laurel Oaks Drive (a 50 foot R.O.W.), said point being on a curve to the left, having a central angle of 02 degrees 22 minutes 36 seconds, a radius of 365.00 feet and a chord bearing and distance of South 03 degrees 46 minutes 48 seconds East, 15.14 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE Along said Laurel Oaks Drive Westerly line and around said curve, an arc distance of 15.14 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE along OAKRIDGE NO. 2 Westerly line the Following:

North 85 degrees 54 minutes 04 seconds West, a distance of 87.14 feet to an "X" found in concrete golf cart path at corner;

South 66 degrees 26 minutes 24 seconds West, a distance of 33.04 feet to the beginning of a curve to the left, having a central angle of 106 degrees 46 minutes 38 seconds, a radius of 50.00 feet and a chord bearing and distance of South 13 degrees 23 minutes 48 seconds West, 80.27 feet, a 3/8 inch iron rod found at corner;

Around said curve, an arc distance of 93.18 feet to the end of said curve, a 1/2 inch iron rod found at corner;

South 39 degrees 59 minutes 34 seconds East, a distance of 138.93 feet to a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 23 degrees 39 minutes 34 seconds East, a distance of 390.00 feet to the beginning of a curve to the left, having a central angle of 47 degrees 20 minutes 00 seconds, a radius of 660.00 feet, and a chord bearing and distance of South 47 degrees 19 minutes 34 seconds East, 529.87 feet, a 1/2 inch iron rod found, at corner;

Around said curve, an arc distance of 545.24 feet to the end of said curve, a P.K. nail found on Railroad tie retaining wall at corner;

South 70 degrees 59 minutes 34 seconds East, a distance of 112.67 feet to the beginning of a curve to the right, having a central angle of 22 degrees 30 minutes 00 seconds, a radius of 700.00 feet, and a chord bearing and distance of South 59 degrees 44 minutes 34 seconds East, 273.13 feet, a 1/2 inch iron rod found at corner;

THENCE around said curve, at an arc distance of 212.18 feet, passing the most Westerly corner of the Replat of Lots 51 & 52, Block I of Oakridge No. 2, an addition to the City of Garland, according to the plat thereof recorded in Volume 82116, Page 1972, Map Records, Dallas County, Texas, and continuing a total arc distance of 274.89 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE South 48 degrees 29 minutes 34 seconds East, a distance of 5.79 feet to a point at the most Southerly corner of said Replat of Lots 51 and 52, Block I of Oakridge No. 2, on the Westerly line of Diamond Oaks Drive, (a 60 foot R.O.W.), a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE Along said Diamond Oaks Drive Westerly line, the following:

South 41 degrees 30 minutes 00 seconds West, a distance of 4.20 feet to the beginning of a curve to the left, having a central angle of 90 degrees 00 minutes 06 seconds, a radius of

114.17 feet, and a chord bearing and distance of South 03 degrees 30 minutes 00 seconds East, 161.46 feet, a 1/2 inch iron rod found, at corner;

Around said curve an arc distance of 179.34 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 48 degrees 30 minutes 00 seconds East, a distance of 177.91 feet to the beginning of a curve to the right, having a central angle of 96 degrees 06 minutes 26 seconds, a radius of 191.86 feet, and a chord bearing and distance of South 00 degrees 26 minutes 45 seconds East, 285.40 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 321.82 to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 47 degrees 36 minutes 31 seconds West, a distance of 90.00 feet to the beginning of a curve to the right, having a central angle of 38 degrees 23 minutes 29 seconds, a radius of 268.29 feet, and a chord bearing and distance of South 66 degrees 48 minutes 16 seconds West, 176.43 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve an arc distance of 179.77 feet to the end of said curve, a 1/2 inch iron rod found, at corner;

THENCE South 86 degrees 00 minutes 00 seconds West, a distance of 222.93 feet to a point on the Easterly line of OAKRIDGE NO. 1, an addition to the City of Garland, according to the plat thereof recorded in Volume 81004, Page 3294, Map Records, Dallas County, Texas, said point being on a curve to the left, having a central angle of 44 degrees 12 minutes 16 seconds, a radius of 400.00 feet, and a chord bearing and distance of North 43 degrees 18 minutes 25 seconds West, 301.01 feet, a 1/2 inch iron rod found, at corner;

THENCE Along said OAKRIDGE NO. 1 Easterly line, the following:

Around the last mentioned curve to the left, an arc distance of 308.61 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 65 degrees 24 minutes 33 seconds West, a distance of 237.46 feet to the beginning of a curve to the right, having a central angle of 19 degrees 30 minutes 00 seconds, a radius of 500.00 feet, and a chord bearing and distance of North 55 degrees 39 minutes 33 seconds West, 169.35 feet, a 1/2 inch iron rod found, at corner;

Around said curve, an arc distance of 170.17 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 45 degrees 54 minutes 33 seconds West, a distance of 1037.59 feet to the beginning of a curve to the right, having a central angle of 11 degrees 50 minutes 00 seconds, a radius of 500.00 feet, and a chord bearing and distance of North 40 degrees 07 minutes 30 seconds West, 103.08 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 103.27 feet to the end of said curve, a 1/2 inch iron rod found at corner;

North 34 degrees 12 minutes 31 seconds West, a distance of 127.65 feet to the beginning of a curve to the left, having a central angle of 30 degrees 17 minutes 08 seconds, a radius of 500.00 feet, and a chord bearing and distance of North 49 degrees 21 minutes 05 seconds West, 261.22 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 264.29 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 64 degrees 29 minutes 39 seconds West, a distance of 99.74 feet to the beginning of a curve to the right, having a central angle of 17 degrees 00 minutes 00 seconds, a radius of 500.00 feet, and a chord bearing and distance of North 55 degrees 59 minutes 39 seconds West, 147.81 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 148.35 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 47 degrees 29 minutes 39 seconds West, a distance of 525.27 feet to a point on the previously mentioned Jupiter Road Easterly line, an "X" found on top of brick column at corner;

THENCE North 00 degrees 25 minutes 18 seconds East, a distance of 450.00 feet along the said Jupiter Road Easterly line, to a 1/2 inch iron rod found at corner;

THENCE North 47 degrees 03 minutes 22 seconds East, a distance of 20.60 feet along a right-of-way cutback line to the PLACE OF BEGINNING and containing 2,511,125.15 square feet or 57.6475 acres of land.

LEGAL DESCRIPTION

TRACT B

BEING a 9.3544 acre tract of land, situated in the WILLIAM CRITTENTON SURVEY, ABSTRACT NO. 334, City of Garland, Dallas County, Texas and being all that certain tract of land referred to as Tract B, conveyed from National Golf Operating Partnership L.P., a Delaware limited partnership to Oakridge Golf Club L.P., a Texas limited partnership by deed recorded in Volume 2002030, Page 03443, of the Deed Records of Dallas County, Texas, and being more particularly described as follows:

BEGINNING at an "X" found in concrete at the most Southerly corner of Lot 57, Block 2 of Oakridge No. 2, an addition to the City of Garland, according to the plat thereof recorded in Volume 81004, Page 3272, Map Records, Dallas County, Texas, on the Northwesterly line of Stoneridge Drive (a 60 foot R.O.W.);

THENCE South 41 degrees 30 minutes 26 seconds West, along said Stoneridge Drive Northwesterly line, a distance of 291.08 feet to the beginning of a curve to the right, having a central angle of 60 degrees 08 minutes 22 seconds, and a radius of 50.00 feet and a chord bearing and distance of South 71 degrees 34 minutes 37 seconds West, 50.11 feet, an "X" found, at corner;

THENCE Along said Stoneridge Drive Northwesterly line and around said curve, an arc distance of 52.48 feet to the end of said curve at the most Southerly corner of Lot 1 of said Block 2 of Oakridge No. 2, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE Along said Addition line of OAKRIDGE NO. 2, the Following:

North 40 degrees 12 minutes 50 seconds East, a distance of 94.23 feet to the beginning of a non-tangent curve to the left, having a central angle of 21 degrees 12 minutes 24 seconds, a radius of 950.00 feet and a chord bearing and distance of North 60 degrees 23 minutes 22 seconds West, 349.62 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 351.62 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 70 degrees 59 minutes 34 seconds West, a distance of 112.67 feet to the beginning of a curve to the right having a central angle of 47 degrees 20 minutes 00 seconds, a radius of 410.00 feet and a chord bearing and distance of North 47 degrees 19 minutes 34 seconds West, 329.16 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 338.71 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 23 degrees 39 minutes 34 seconds West a distance of 466.43 feet to the beginning of a curve to the left having a central angle of 70 degrees 59 minutes 58 seconds, a radius of 40.00 feet and a chord bearing and distance of North 59 degrees 09 minutes 34 seconds West, 46.46 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 49.57 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 85 degrees 20 minutes 26 seconds West, a distance of 61.58 feet to a point on the Easterly line of Laurel Oaks Drive (a 50 foot R.O.W.), same point being the beginning of a non-tangent curve to the right having a central angle of 02 degrees 43 minutes 44 seconds, a radius of 315.00 feet and a chord bearing and distance of North 04 degrees 39 minutes 39 seconds West, 15.00 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE Along said Laurel Oaks Drive Easterly line and around said curve, an arc distance of 15.00 feet to the end of the said curve at the most Southerly corner of Lot 26 of said Block 2 of Oakridge No. 2, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE Continuing with said Addition line of OAKRIDGE NO. 2, the Following:

North 85 degrees 20 minutes 26 seconds East, leaving said Laurel Oaks Drive Easterly line, a distance of 66.80 feet to the beginning of a curve to the left having a central angle of 70 degrees 53 minutes 58 seconds, a radius of 40.00 feet and a chord bearing and distance of North 49 degrees 53 minutes 26 seconds East, 46.40 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve an arc distance of 49.50 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 14 degrees 37 minutes 18 seconds East, a distance of 151.24 feet to an interior corner of Lot 29 of said Block 2 of Oakridge No. 2, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 86 degrees 13 minutes 57 seconds East, a distance of 109.23 feet to the beginning of a curve to the right having a central angle of 70 degrees 12 minutes 46 seconds, a radius of 100.00 feet and a chord bearing and distance of South 58 degrees 50 minutes 07 seconds East, 115.02 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve an arc distance of 122.54 feet to the end of said curve, an "X" found in concrete, at corner;

South 23 degrees 38 minutes 52 seconds East, a distance of 282.63 feet to the beginning of a curve to the left having a central angle of 37 degrees 40 minutes 34 seconds and a radius of 440.00 feet and a chord bearing and distance of South 42 degrees 29 minutes 08 seconds East, 284.15 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve an arc distance of 289.33 feet to the end of said curve, and to the beginning of a reverse curve to the right having a central angle of 12 degrees 48 minutes 06 seconds, a radius of 660.00 feet and a chord bearing and distance of South 54 degrees 55 minutes 22 seconds East, 147.16 feet to a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve an arc distance of 147.46 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 48 degrees 31 minutes 19 seconds East, a distance of 465.00 feet to the POINT OF BEGINNING and containing 407,476.82 square feet or 9.3544 acres of land.

LEGAL DESCRIPTION

TRACT C

BEING a 10.1044 tract of land, situated in the LEVI TURNER SURVEY, ABSTRACT NO. 1487, City of Garland, Dallas County, Texas, and being all that certain tract of land referred to as Tract C, conveyed from National Golf Operating Partnership L.P., a Delaware limited partnership to Oakridge Golf Club L.P., a Texas limited partnership by deed recorded in Volume 2002030, Page 03443, of the Deed Records of Dallas County, Texas, and being more particularly described as follows:

BEGINNING at a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC. at the Northwest corner of Lot 1, Block 9 of Oakridge No. 9, an addition to the City of Garland, according to the plat thereof recorded in Volume 84136, Page 4082, Map Records, Dallas County, Texas on the Southeasterly line of Oak Point Drive, (a 50 foot R.O.W.)

THENCE North 23 degrees 49 minutes 46 seconds East, along said Oak Point Drive Southeasterly line, a distance of 174.97 feet to the beginning of a curve to the right, having a central angle of 37 degrees 48 minutes 34 seconds, a radius of 250.00 feet and a chord bearing and distance of North 42 degrees 29 minutes 35 seconds East, 162.00 feet, a 1/2 inch iron rod found, at corner;

THENCE continuing along said Oak Point Drive Southerly line and around said curve, an arc distance of 164.97 feet to the end of said curve, at the Northwest corner of Lot 48, block 9 of Oakridge No. 12, an addition to the City of Garland, according to the plat thereof recorded in Volume 89084, Page 2573, Map Records, Dallas County, Texas, a 1/2 inch iron rod found, at corner;

THENCE South 28 degrees 36 minutes 09 seconds East, leaving said Oak Point Drive Southerly line along the West line of said Lot 48, a distance of 125.00 feet to the Southwest corner of said Lot 48, a 1/2 inch iron rod found, at corner;

THENCE North 68 degrees 50 minutes 22 seconds East, along the South line of said Lot 48, a distance of 67.14 feet to the beginning of a non-tangent curve to the right, having a central angle of 21 degrees 41 minutes 14 seconds, a radius of 600.00 feet and a chord bearing and distance of South 59 degrees 16 minutes 52 seconds East, 225.75 feet, said point being at the Southwest corner of Lot 47, Block 9 of Oakridge No. 11, an addition to the City of Garland, as recorded n Volume 84136, Page 4096, Map Records, Dallas County, Texas, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE along the South line of said Block 9 of Oakridge No. 11 the following:

Around said curve, an arc distance of 227.11 feet to the end of said curve, a 1/2 inch iron rod found, at corner;

South 48 degrees 26 minutes 15 seconds East, a distance of 131.21 feet to the beginning of a curve to the left, having a central angle of 27 degrees 05 minutes 17 seconds, a radius of 400.00 feet and a chord bearing and distance of South 61 degrees 58 minutes 53 seconds East, 187.35 feet, a 1/2 inch iron rod found, at corner;

Around said curve, an arc distance of 189.11 feet to the end of said curve, and to the beginning of a reverse curve to the right, having a central angle of 36 degrees 05 minutes 12 seconds, a radius of 100.00 feet and a chord bearing and distance of South 57 degrees 28 minutes 51 seconds East, 61.95 feet, a 1/2 inch iron rod found, at corner;

Around said curve, an arc distance of 62.98 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 39 degrees 26 minutes 15 seconds East, a distance of 218.00 feet to the beginning of a curve to the left having a central angle of 27 degrees 00 minutes 00 seconds, a radius of 550.00 feet and a chord bearing and distance of South 52 degrees 56 minutes 15 seconds East, 256.79 feet, an "X" found on top of "y" inlet, at corner;

Around said curve an arc distance of 259.18 feet to the end of said curve, a 3/8 inch iron rod found, at corner;

South 66 degrees 26 minutes 15 seconds East, a distance of 33.32 feet to the beginning of a curve to the right, having a central angle of 40 degrees 39 minutes 56 seconds, a radius of 595.00 feet and a chord bearing and distance of South 46 degrees 06 minutes 18 seconds East, 413.49 feet, a 1/2 inch iron rod found, at corner;

Around said curve an arc distance of 422.30 feet to the end of said curve, a 1/2 inch iron rod found, at corner;

South 25 degrees 46 minutes 22 seconds East, a distance of 18.45 feet to the most Southerly corner of Lot 29 of said Block 9 of Oakridge No. 11, a 1/2 inch iron rod found, at corner;

North 67 degrees 04 minutes 24 seconds East, a distance of 125.20 feet to the most Easterly corner of said Lot 29 on the above-mentioned Oak Point Drive Southwesterly line, a 1/2 inch iron rod found, at corner;

THENCE South 25 degrees 46 minutes 59 seconds East, along said Oak Point Drive Southerly line, a distance of 40.05 feet to the most northerly corner of Lot 28 of said Block 9 of Oakridge No. 11, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE South 67 degrees 04 minutes 24 seconds West, along the Northwest line of said Lot 28 and the Northwest line of Lot 21 of said Block 9 of Oakridge No. 11, a distance of 252.09 feet to an interior corner of said Lot 21 and the beginning of a non-

tangent curve to the right, having a central angle of 22 degrees 43 minutes 58 seconds, a radius of 1100.00 feet and a chord bearing and distance of North 62 degrees 19 minutes 43 seconds West, 433.59 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE around said curve and along the most Southerly Northeast line of said Block 9 of Oakridge No. 11, an arc distance of 436.44 feet to the end of said curve, an "X" found on the top of a brick column at corner;

THENCE North 50 degrees 57 minutes 43 seconds West, continuing along said Block 9 of Oakridge No. 11 most Southerly Northeast line and along a North line of previously said Block 9 of Oakridge No. 9, a distance of 737.17 feet to the beginning of a curve to the left, having a central angle of 23 degrees 54 minutes 29 seconds, a radius of 330.00 feet and a chord bearing and distance of North 62 degrees 54 minutes 57 seconds West, 136.70 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE continuing along said Block 9 of Oakridge No. 9 North line, the following:

Around said curve a distance of 137.70 feet to the end of said curve, a 3/8 inch iron rod found, at corner;

North 74 degrees 52 minutes 14 seconds West, a distance of 242.82 feet to a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 51 degrees 34 minutes 25 seconds West, a distance of 102.43 feet to the POINT OF BEGINNING and containing 440,148.30 square feet or 10.1044 acres of land.

LEGAL DESCRIPTION

TRACT D

BEING a 75.1025 acre tract of land, situated in the WILLIAM CRITTENTON SURVEY, ABSTRACT NO. 334, and the LEVY TURNER SURVEY, ABSTRACT NO. 1487, City of Garland, Dallas County, Texas, and being all that certain tract of land referred to as Tract D, conveyed from National Golf Operating Partnership L.P., a Delaware limited partnership to Oakridge Golf Club L.P., a Texas limited partnership by deed recorded in Volume 2002030, Page 03443, of the Deed Records of Dallas County, Texas, and being more particularly described as follows:

BEGINNING at the intersection of the Southeasterly line of Stoneridge Drive, (a 60 foot R.O.W.) and the Southwesterly line of Big Oaks Drive (a 60 foot R.O.W.), said beginning point also being at the most Northerly point of Oakridge Country Club, an Addition to the City of Garland, Texas, recorded in Volume 82245, Page 2025, of the Deed Records of Dallas County, Texas, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., for corner;

THENCE along the said Southwesterly line of Big Oaks Drive, the following:

South 48 degrees 32 minutes 05 seconds East, a distance of 73.04 feet to the beginning of a curve to the right, having a central angle of 08 degrees 10 minutes 01 seconds, a radius of 500.00 feet, and a chord bearing and distance of South 44 degrees 27 minutes 05 seconds East, 71.21 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 71.27 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 40 degrees 22 minutes 05 seconds East, a distance of 77.46 feet to the beginning of a curve to the left, having a central angle of 29 degrees 09 minutes 58 seconds, a radius of 430.00 feet, and a chord bearing and distance of South 54 degrees 57 minutes 04 seconds East, 216.53 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve a distance of 218.89 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 69 degrees 32 minutes 05 seconds East, a distance of 69.99 feet to the most Northerly corner of Lot 56, Block 10, of Oakridge No. 8, an addition to the City of Garland, according to the plat thereof recorded in Volume 84012, Page 3363, of the Deed Records of Dallas County, Texas, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE along the Southwesterly line of said Oakridge No. 8, the following:

South 20 degrees 28 minutes 38 seconds West, a distance of 110.09 feet to a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC. at corner;

South 69 degrees 31 minutes 22 seconds East, distance of 193.58 feet to the beginning of a curve to the right, having a central angle of 57 degrees 56 minutes 48 seconds, a radius of 250.00 feet and a chord bearing and distance of South 40 degrees 32 minutes 58 seconds East, 242.20 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 252.84 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 11 degrees 34 minutes 37 seconds East, a distance of 311.91 feet to the beginning of a curve to the left, having a central angle of 36 degrees 15 minutes 36 seconds, a radius of 620.00 feet, and a chord bearing and distance of South 29 degrees 42 minutes 25 seconds East, 385.85 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, passing a Southerly corner of said Oakridge Country Club, at a distance of 188.09 feet, and continuing for a total distance of 392.37 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 47 degrees 50 minutes 13 seconds East, a distance of 346.55 feet to the Southwest corner of said Oakridge No. 8, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE North 42 degrees 09 minutes 47 seconds East, a distance of 120.00 feet to point on the Southwesterly line of Fulton Drive (a 50 foot R.O.W.), a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE South 47 degrees 50 minutes 13 seconds East, a distance of 17.92 feet to the most Northerly corner of Lot 28, Block 10 of Oakridge No. 7, an addition to the City of Garland, according to the plat thereof recorded in Volume 83112, Page 4179, of the Deed Records of Dallas County, Texas, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE South 42 degrees 09 minutes 47 seconds West, a distance of 120.00 feet along the Northwesterly line of said Lot 28, Block 10, to a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at the Southwest corner of said Lot 28, Block 10;

THENCE South 47 degrees 50 minutes 13 seconds East, a distance of 1059.14 feet along the Southwesterly line of said Oakridge No. 7, to an interior corner of said Oakridge No. 7, a 3/8 inch iron rod found, at corner;

THENCE South 00 degrees 14 minutes 50 seconds West, a distance of 341.88 feet along the said Oakridge No. 7 Westerly line, to the Southwest corner of said Oakridge No. 7 on the North line of a tract of land conveyed to Kirk Scott Johnson and Jennifer Nicholson Johnson by deed recorded in Volume 94050, Page 02432, of the Deed Records of Dallas County, Texas, a 3/8 inch iron rod found, at corner;

THENCE along said Kirk Scott Johnson and Jennifer Nicholson Johnson property, the following:

North 89 degrees 45 minutes 10 seconds West, a distance of 370.00 feet to a point for corner;

South 50 degrees 47 minutes 34 seconds East, a distance of 157.71 feet to a point for corner;

South 12 degrees 13 minutes 10 seconds East, a distance of 184.21 feet to a point for corner;

THENCE South 02 degrees 43 minutes 50 seconds West, a distance of 194.83 feet to a point for corner at the most Northerly Southwest corner of said Kirk Scott Johnson and Jennifer Nicholson Johnson property and the most Northerly corner of Oakridge on the Creek, an addition to the City of Garland, according to the plat thereof recorded in Volume 2004037, Page 01258, of the Deed Records of Dallas County, Texas;

THENCE along the North line of said Oakridge on the Creek, the following;

South 73 degrees 22 minutes 50 seconds West, a distance of 91.04 feet to a point for corner;

South 31 degrees 29 minutes 50 seconds West, a distance of 297.89 feet to a point for corner;

North 66 degrees 35 minutes 40 seconds West, a distance of 339.85 feet to a point for corner;

THENCE South 75 degrees 48 minutes 17 seconds West, a distance of 116.08 feet to a point for corner on the southeasterly line of a tract of land conveyed to Carl David Bolin and Julianne Bolin by deed recorded in Volume 90165, Page 2657, Deed Records, Dallas County, Texas;

THENCE North 26 degrees 53 minutes 01 seconds East, at a distance of 28.98 feet passing the most Easterly corner of said Bolin tract and the most Southerly corner of a tract of land conveyed to Garland Floor Service and Supply, Inc. by deed recorded in Volume 87197, Page 3294, Deed Records, Dallas County, Texas, at a distance of 190.00 feet passing the most northerly corner of said Garland Floor Service and Supply, Inc. tract and the most Southerly Southeast corner of Lot 13, Block 13, of Oakridge No. 11,

an Addition to the City of Garland, Texas, recorded in Volume 84136, Page 4096, of the Deed Records of Dallas County, Texas, and continuing for a total distance of 270.00 feet to the Easterly corner of Lot 14, of said Block 13, of Oakridge No. 11, a 1/2 inch iron rod found, at corner;

THENCE along the Easterly line of said Oakridge No. 11, the following:

North 25 degrees 46 minutes 59 seconds West, a distance of 460.01 feet to a 3/8 inch iron rod found, at corner;

South 67 degrees 03 minutes 29 seconds West, a distance of 125.15 feet to a point on the Northeasterly line of Oak Point Drive (a 50 foot R.O.W.), a 1/2 inch iron rod found, at corner;

North 25 degrees 46 minutes 59 seconds West, a distance of 40.05 feet along said Oak Point Drive Northeasterly line, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 67 degrees 03 minutes 29 seconds East, a distance of 125.15 feet to a 1/2 inch iron rod found, at corner;

North 25 degrees 46 minutes 59 seconds West, a distance of 33.29 feet to the beginning of a curve to the left, having a central angle of 40 degrees 39 minutes 16 seconds, a radius of 895.00 feet, and a chord bearing and distance of North 46 degrees 06 minutes 37 seconds West, 621.81 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 635.05 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 66 degrees 26 minutes 15 seconds West, a distance of 33.32 feet to the beginning of a curve to the right, having a central angle of 27 degrees 00 minutes 00 seconds, a radius of 250.00 feet and a chord bearing and distance of North 52 degrees 56 minutes 15 seconds West, 116.72 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 117.81 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 39 degrees 26 minutes 15 seconds West, a distance of 217.85 feet to the beginning of a curve to the left, having a central angle of 36 degrees 05 minutes 11 seconds, a radius of 400.00 feet and a chord bearing and distance of North 57 degrees 28 minutes 50 seconds West, 247.79 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 251.93 feet to the end of said curve, and to the beginning of a curve to the right, having a central angle of 27 degrees 05 minutes 16 seconds, a radius of 100.00 feet and a chord bearing and distance of North 61 degrees 58 minutes 47 seconds West, 46.84 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 47.28 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE North 48 degrees 26 minutes 09 seconds West, a distance of 131.55 feet to the most Northerly corner of Lot 35, Block 13, of said Oakridge No. 11 and the most Easterly corner of Lot 36, Block 13 of Oakridge No. 12, an addition to the City of Garland, according to the plat thereof recorded in Volume 89084, Page 2573, Map Records, Dallas County, Texas, said lot corner being at the beginning of a curve to the left, having a central angle of 16 degrees 28 minutes 07 seconds, a radius of 900.00 feet and a chord bearing and distance of North 56 degrees 40 minutes 13 seconds West, 257.80 feet, a 1/2 inch iron rod found, at corner;

THENCE around said curve and along the North line of said Oakridge No. 12, a distance of 258.69 feet to the end of said curve and the beginning of a curve to the left having a central angle of 54 degrees 37 minutes 20 seconds, a radius of 425.00 feet and a chord bearing and distance of South 87 degrees 47 minutes 03 seconds West, 390.00 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE around said curve and continuing along said North line of Oakridge No. 12, an arc distance of 405.17 feet to the end of said curve at the most Westerly corner of Lot 42, Block 13 of said Oakridge No. 12 on the Northeasterly line of Lot 43, Block 7 of Oakridge No. 9, an addition to the City of Garland, according to the plat thereof recorded in Volume 84136, Page 4082, Map Records, Dallas County, Texas, a 1/2 inch iron rod found, at corner;

THENCE North 29 degrees 31 minutes 38 seconds West, a distance of 0.88 feet along said Northeasterly line of Lot 43, Block 7, of OAKRIDGE NO. 9, to the most Northerly corner of said Lot 43, said corner being at the beginning of a non-tangent curve to the left having a central angle of 31 degrees 27 minutes 46 seconds, a radius of 425.88 feet and a chord bearing and distance of South 44 degrees 47 minutes 50 seconds West, 230.94 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

THENCE along an Addition line of OAKRIDGE NO. 9, the following:

Around the previously mentioned curve, an arc distance of 233.86 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 29 degrees 15 minutes 20 seconds West, a distance of 231.58 feet to an "X" found in concrete golf cart path, at corner;

South 66 degrees 35 minutes 28 seconds East, a distance of 145.73 feet to a point on the Northwesterly line of Oak Point Drive (a 50 foot R.O.W.), a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

South 23 degrees 45 minutes 00 seconds West, a distance of 3.45 feet along the said Oak Point Drive Northwesterly line to the beginning of a curve to the right, having a central angle of 04 degrees 06 minutes 34 seconds, a radius of 225.00 feet and a chord bearing and distance of South 25 degrees 48 minutes 17 seconds West, 16.14 feet, a 3/8 inch iron rod found, at corner;

Around said curve and along said Oak Point Drive, a Northwesterly line, a distance of 16.14 feet to the end of said curve, a 1/2 inch iron rod found, at corner;

North 66 degrees 35 minutes 28 seconds West, a distance of 210.60 feet to an interior corner of said Oakridge No. 9, a 3/8 inch iron rod found, at corner;

North 11 degrees 34 minutes 23 seconds East, passing the most Northerly corner of Lot 32, Block 7 of said Oakridge No. 9 and a Northeast corner of Oakridge No. 1, at a distance of 391.80 feet, and continuing along the most Easterly line of said Oakridge No. 1, for a total distance of 580.00 feet to the most Easterly Northeast corner of said Oakridge No. 1, on the Southerly line of Diamond Oaks Drive (a 60 foot R.O.W.), a 1/2 inch iron rod found, at corner;

THENCE along said Southerly line of Diamond Oaks Drive, the following:

North 60 degrees 34 minutes 23 seconds East, a distance of 102.21 feet to the beginning of a curve to the right, having a central angle of 25 degrees 25 minutes 35 seconds, a radius of 335.35 feet and a chord bearing and distance of North 73 degrees 17 minutes 11 seconds East, 147.60 feet, a 1/2 iron rod found, at corner;

Around said curve, an arc distance of 148.82 feet to the end of said curve, a 1/2 inch iron rod found, at corner;

North 86 degrees 00 minutes 00 seconds East, a distance of 133.46 feet to the beginning of a curve to the left, having a central angle of 38 degrees 23 minutes 28 seconds, a radius of 328.29 feet and a chord bearing and distance of North 66 degrees 48 minutes 19 seconds East, 215.88 feet, a 1/2 inch iron rod found, at corner;

Around said curve, an arc distance of 219.97 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 47 degrees 36 minutes 31 seconds East, a distance of 90.00 feet to the beginning of a curve to the left, having a central angle of 96 degrees 06 minutes 26 seconds, a radius of 251.86 feet and a chord bearing and distance of North 00 degrees 26 minutes 42 seconds West, 374.65 feet, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

Around said curve, an arc distance of 422.47 feet to the end of said curve, a 1/2 inch iron rod found, at corner;

North 48 degrees 30 minutes 00 seconds West, a distance of 167.91 feet to the beginning of a curve to the right, having a central angle of 90 degrees 00 minutes 47 seconds, a radius of 64.17 feet and a chord bearing and distance of North 03 degrees 30 minutes 02 seconds West, 90.76 feet, a 1/2 inch iron rod found, at corner;

Around said curve, an arc distance of 100.81 feet to the end of said curve, a 5/8 inch iron rod found with yellow plastic cap stamped D.C.A. INC., at corner;

North 41 degrees 30 minutes 26 seconds East, along Diamond Oaks Drive East line and the East line of Stoneridge Drive, a distance of 584.73 feet to the POINT OF BEGINNING and containing 3,271,464.40 square feet or 75.1025 acres of land.

LEGAL DESCRIPTION

TRACT E
EASEMENT ESTATE
GOLF CART EASEMENT NO. 1

BEING a 360.02 square foot tract of land, situated in the William Crittenton Survey,
Abstract No. 334 in the City of Garland, Dallas County, Texas and being a tract of land
conveyed to Oakridge Golf Club L.P., in Exhibit "B", by Dedication Deed, recorded in
Volume 2003173, Page 24024 of the Deed Records, Dallas County, Texas, more
particularly described by metes and bounds as follows:

COMMENCING at a 5/8 inch iron rod found at the most Northerly corner of Lot 1,
Block 1 of Oakridge Country Club, an addition to the City of Garland, according to the
plat thereof recorded in Volume 82245, Page 2025, Map Records, Dallas County, Texas
and at the most Northerly Northeast corner of said Oakridge Golf Club L.P. tract;

THENCE South 41 degrees 30 minutes 26 seconds West, along the Northwest line of
said Lot 1, Block 1 of Oakridge Country Club and along the most Northerly Southeast
line of said Oakridge Golf Club L.P. tract, a distance of 306.97 feet to a point for corner
and the POINT OF BEGINNING;

THENCE South 41 degrees 30 minutes 26 seconds West, continuing along said Lot 1,
Block 1 of Oakridge Country Club Northwest line and said Oakridge Golf Club L.P. tract
most Northerly Southeast line, a distance of 6.00 feet to a point for corner;

THENCE North 47 degrees 36 minutes 47 seconds West, a distance of 60.00 feet to a
point for corner on the Southeast line of a tract of land conveyed to Oakridge Golf Club
L.P. as Tract B by deed recorded in Volume 2002030, Page 03443, Deed Records, Dallas
County, Texas, said point for corner being South 41 degrees 30 minutes 26 seconds West,
along said Tract B Southeast line, a distance of 211.50 feet from the most Southerly
corner of Lot 57, Block 2 of said Oakridge No. 2;

THENCE North 41 degrees 30 minutes 26 seconds East, along said Tract B Southeast
line, a distance of 6.00 feet to a point for corner;

THENCE South 47 degrees 36 minutes 47 seconds East, a distance of 60.00 feet to the
POINT OF BEGINNING and containing 360.02 square feet or 0.0083 acres of land.

LEGAL DESCRIPTION

TRACT E
EASEMENT ESTATE
GOLF CART EASEMENT NO. 2

BEING a 7,178.59 square foot tract of land, situated in the William Crittenton Survey, Abstract No. 334 in the City of Garland, Dallas County, Texas and being a tract of land conveyed to Oakridge Golf Club L.P., in Exhibit "B", by Dedication Deed, recorded in Volume 2003173, Page 24024, of the Deed Records, Dallas County, Texas, more particularly described by metes and bounds as follows:

COMMENCING at a 5/8 inch iron rod found at the most Southerly corner of Lot 1, Block 2 of said Oakridge No. 2 and the most Easterly Southwest corner of a tract of land conveyed as Tract B to Oakridge Golf Club L.P. by Special Warranty Deed, recorded in Volume 2002030, Page 03443, Deed Records, Dallas County, Texas on the Northwest right-of-way line of Stoneridge Drive, (variable width right-of-way at this point), said 5/8 inch iron rod found being in a curve to the left having a delta of 09 degrees 43 minutes 18 seconds, a radius of 50.00 feet and a chord bearing and distance of South 83 degrees 12 minutes 51 seconds East, 8.47 feet;

THENCE around said curve to the left and along said Stoneridge Drive Northwest right-of-way line, an arc distance of 8.48 feet to a point for corner and the POINT OF BEGINNING, said point for corner being at the end of said curve and the beginning of a curve to the left having a delta of 06 degrees 16 minutes 27 seconds, a radius of 50.00 feet and a chord bearing and distance of North 88 degrees 47 minutes 16 seconds East, 5.47 feet;

THENCE continuing around said curve to the left and along said Stoneridge Drive Northwest right-of-way line, an arc distance of 5.48 feet to a point for corner;

THENCE South 22 degrees 46 minutes 28 seconds West, leaving said Stoneridge Drive Northwest right-of-way line, a distance of 74.72 feet to a point for corner on the back of curb on the North side of Diamond Oaks Drive, (variable width right-of-way at this point);

THENCE along said back of curb on the North side of Diamond Oaks Drive with its meanders as follows:

South 41 degrees 23 minutes 35 seconds West, a distance of 85.21 feet to a point for corner at the beginning of a curve to the left having a delta of 93 degrees 00 minutes 58 seconds, a radius of 104.44 feet and a chord bearing and distance of South 00 degrees 29 minutes 26 seconds West, 151.53 feet;

Around said curve to the left, an arc distance of 169.55 feet to a point for corner;

South 48 degrees 26 minutes 55 seconds East, a distance of 180.84 feet to a point for corner at the beginning of a curve to the right having a delta of 77 degrees 27 minutes 35 seconds, a radius of 217.69 feet and a chord bearing and distance of South 08 degrees 21 minutes 04 seconds East, 272.40 feet;

Around said curve to the right, an arc distance of 294.30 feet to a point for corner at the end of said curve and the beginning of a curve to the right having a delta of 07 degrees 59 minutes 41 seconds, a radius of 281.09 feet and a chord bearing and distance of South 39 degrees 43 minutes 03 seconds West, 39.19 feet;

Around said curve to the right, an arc distance of 39.22 feet to a point for corner;

South 47 degrees 24 minutes 01 second West, a distance of 98.24 feet to a point for corner at the beginning of a curve to the right having a delta of 12 degrees 09 minutes 31 seconds, a radius of 248.74 feet and a chord bearing and distance of South 52 degrees 34 minutes 52 seconds West, 52.69 feet;

Around said curve to the right, an arc distance of 52.78 feet to a point for corner;

South 61 degrees 56 minutes 32 second West, a distance of 29.70 feet to a point for corner at the beginning of a curve to the right having a delta of 14 degrees 13 minutes 46 seconds, a radius of 440.21 feet and a chord bearing and distance of South 77 degrees 24 minutes 32 seconds West, 109.05 feet;

Around said curve to the right, an arc distance of 109.33 feet to a point for corner;

South 86 degrees 19 minutes 08 seconds West, a distance of 109.78 feet to a point for corner at the beginning of a curve to the left having a delta of 10 degrees 32 minutes 37 seconds, a radius of 525.00 feet and a chord bearing and distance of South 81 degrees 02 minutes 49 seconds West, 96.47 feet;

Around said curve to the left, an arc distance of 96.61 feet to a point for corner at the end of said curve and the beginning of a non-tangent curve to the left having a delta of 20 degrees 36 minutes 06 seconds, a radius of 136.96 feet and a chord bearing and distance of South 12 degrees 02 minutes 31 seconds East, 48.98 feet;

THENCE around said non-tangent curve to the left, leaving said back of curb on the North side of Diamond Oaks Drive, an arc distance of 49.25 feet to a point for corner on the Northwest line of a tract of land conveyed as Tract D to said Oakridge Golf Club L.P. by Special Warranty Deed, recorded in Volume 2002030, Page 03443, Deed Records, Dallas County, Texas, same being the Southeast right-of-way line of said Diamond Oaks Drive, (variable width right-of-way at this point), said point for corner being in a non-tangent curve to the left having a delta of 00 degrees 51 minutes 36 seconds, a radius of 335.35 feet and a chord bearing and distance of South 74 degrees 18 minutes 04 seconds West, 5.03 feet;

THENCE around said non-tangent curve to the left and along said Diamond Oaks Drive Southeast right-of-way line and along said Tract D Northwest line, an arc distance of 5.03 feet to a point for corner at the beginning of a non-tangent curve to the right having a delta of 27 degrees 34 minutes 42 seconds, a radius of 141.96 feet and a chord bearing and distance of North 08 degrees 19 minutes 07 seconds West, 67.67 feet;

THENCE around said non-tangent curve to the right, an arc distance of 68.33 feet to a point for corner on the Southeast line of a tract of land conveyed as Tract A to said Oakridge Golf Club L.P. by Special Warranty Deed, recorded in Volume 2002030, Page 03443, Deed Records, Dallas County, Texas, same being the Northwest right-of-way line of said Diamond Oaks Drive, (variable width right-of-way at this point), said point for corner being North 86 degrees 00 minutes 00 seconds East, a distance of 13.92 feet from the most Southerly Southwest corner of said Tract A;

THENCE North 86 degrees 00 minutes 00 seconds East, along said Tract A Southeast line and along said Diamond Oaks Drive Northwest right-of-way line, a distance of 5.07 feet to a point for corner at the beginning of a non-tangent curve to the left having a delta of 05 degrees 24 minutes 35 seconds, a radius of 136.96 feet and a chord bearing and distance of South 03 degrees 06 minutes 53 seconds West, 12.93 feet;

THENCE around said non-tangent curve to the left, an arc distance of 12.93 feet to a point for corner, said point for corner being at the beginning of a non-tangent curve to the right having a delta of 07 degrees 51 minutes 27 seconds, a radius of 530.00 feet and a chord bearing and distance of North 79 degrees 50 minutes 03 seconds East, 72.63 feet;

THENCE around said non-tangent curve to the right and (5) five feet from and parallel to said back of curb on the North side of Diamond Oaks Drive, an arc distance of 72.68 feet to a point for corner at the beginning of a non-tangent curve to the right having a delta of 03 degrees 46 minutes 02 seconds, a radius of 399.95 feet and a chord bearing and distance of North 82 degrees 58 minutes 39 seconds West, 26.29 feet;

THENCE around said non-tangent curve to the right, an arc distance of 26.30 feet to a point for corner on said Tract A Southeast line and said Diamond Oaks Drive Northwest right-of-way line;

THENCE North 86 degrees 00 minutes 00 seconds East, along said Tract A Southeast line and along said Diamond Oaks Drive Northwest right-of-way line, a distance of 26.04 feet to a point for corner at the beginning of a non-tangent curve to the left having a delta of 06 degrees 50 minutes 10 seconds, a radius of 394.95 feet and a chord bearing and distance of South 88 degrees 11 minutes 49 seconds East, 47.09 feet;

THENCE around said non-tangent curve to the left, an arc distance of 47.12 feet to a point for corner;

THENCE (5) five feet from and parallel to said back of curb on the North side of Diamond Oaks Drive with its meanders as follows:

North 86 degrees 19 minutes 08 seconds East, a distance of 86.17 feet to a point for corner at the beginning of a curve to the left having a delta of 14 degrees 20 minutes 54 seconds, a radius of 431.60 feet and a chord bearing and distance of North 77 degrees 22 minutes 55 seconds East, 107.80 feet;

LEGAL DESCRIPTION

TRACT E
EASEMENT ESTATE
GOLF CART EASEMENT NO. 2-CONTINUED

Around said curve to the left, an arc distance of 108.08 feet to a point for corner;

North 61 degrees 56 minutes 32 seconds East, a distance of 28.68 feet to a point for corner at the beginning of a curve to the left having a delta of 12 degrees 11 minutes 52 seconds, a radius of 242.96 feet and a chord bearing and distance of North 52 degrees 35 minutes 22 seconds East, 51.63 feet;

Around said curve to the left, an arc distance of 51.72 feet to a point for corner;

North 47 degrees 24 minutes 01 seconds East, a distance of 98.00 feet to a point for corner at the beginning of a curve to the left having a delta of 08 degrees 11 minutes 19 seconds, a radius of 269.56 feet and a chord bearing and distance of North 39 degrees 41 minutes 59 seconds East, 38.49 feet;

Around said curve to the left, an arc distance of 38.53 feet to a point for corner at the end of said curve and the beginning of a curve to the left having a delta of 77 degrees 19 minutes 06 seconds, a radius of 212.69 feet and a chord bearing and distance of North 08 degrees 24 minutes 23 seconds West, 265.73 feet;

Around said curve to the left, an arc distance of 287.02 feet to a point for corner;

North 48 degrees 26 minutes 55 seconds West, a distance of 180.78 feet to a point for corner at the beginning of a curve to the right having a delta of 93 degrees 00 minutes 10 seconds, a radius of 109.43 feet and a chord bearing and distance of North 00 degrees 22 minutes 09 seconds East, 158.76 feet;

Around said curve to the right, an arc distance of 177.63 feet to a point for corner;

North 41 degrees 23 minutes 35 seconds East, a distance of 84.15 feet to a point for corner;

THENCE North 22 degrees 46 minutes 28 seconds East, leaving said line (5) five feet from and parallel to said back of curb on the North side of Diamond Oaks Drive, a distance of 71.67 feet to the POINT OF BEGINNING and containing 7,178.59 square feet or 0.1648 acres of land.

**FILED AND RECORDED**

OFFICIAL PUBLIC RECORDS

*Cynthia Figueroa Calhoun*

Cynthia Figueroa Calhoun, County Clerk

Dallas County TEXAS

January 13, 2006  11:11:20 AM

FEE: $216.00        200600014701